**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| State of North Dakota, | |
| Plaintiff, | |
| vs. | Case No. 1:21-cv-00148 |
| The United States Department of Interior; Debra Ann Haaland, in her official capacity as Secretary of Interior; the Bureau of Land Management; Nada Culver, in her official capacity as acting Director of the Bureau of Land Management; and John Mehlhoff, in his official capacity as the acting Director of the Montana-Dakotas Bureau of Land Management, | |
| Defendants.[1] | |
| Center for Biological Diversity; Sierra Club; Western Organization of Resource Councils; and Dakota Resource Council, | |
| Defendant-Intervenors. | |
| State of North Dakota, | |
| Plaintiff, | |
| vs. | |
| The United States Department of Interior; Debra Ann Haaland, in her official capacity as Secretary of Interior; the Bureau of Land Management; Tracy Stone Manning, in her official capacity as the Director of the Bureau of Land Management; and Sonya Germann, in her official capacity as the Director of the Montana-Dakotas Bureau of Land Management, | |
| Defendants. | |

---

[1] Since this case's inception in 2021, the directors of the Bureau of Land Management have changed and this case has been consolidated. See Doc. No. 67.

- 1 -

**ORDER GRANTING, IN PART, AND DENYING, IN PART, NORTH DAKOTA'S MOTION FOR PRELIMINARY INJUNCTION**

[¶ 1]   THIS MATTER comes before the Court upon a Motion for Preliminary Injunction filed by the Plaintiff, the State of North Dakota ("North Dakota" or the "State"), on January 9, 2023. Doc. No. 68. The Defendants (the "Federal Defendants") and Defendant-Intervenors (the "Intervenors") filed their Responses on February 9, 2023. Doc. Nos. 73, 74. The State filed a Reply on February 17, 2023. Doc. No. 81. A hearing on North Dakota's Motion was held on February 21, 2023. Doc. Nos. 84, 86. The Parties also submitted post-hearing briefing. Doc. Nos. 91, 93, 97. The Federal Defendants have filed an Objection to portions of the Declaration of Lynn Helms, a declarant for the State. Doc. No. 96.

[¶ 2]   This case presents the issue of whether the Federal Defendants were derelict in their mandatory statutory duties to evaluate federal lands nominated for oil and gas leasing in North Dakota and correspondingly hold lease sales in 2021 and 2022. For the reasons set forth below, the Court finds North Dakota has a substantial likelihood of prevailing on the merits and has met the other factors favoring a preliminary injunction. Given this preliminary stage of litigation and the incomplete administrative record, however, not all of North Dakota's requested relief is appropriate. Accordingly, the State's Motion is **GRANTED, in part, and DENIED, in part**.

**BACKGROUND[2]**

[¶ 3]   On January 27, 2021, President Joseph R. Biden issued Executive Order Number 14008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7619 (Jan. 27, 2021) (the "EO"). Relevant to the present dispute, the EO stated in Section 208:

---

[2] Currently, Wyoming has a similar lawsuit pending in which it challenges the Secretary's actions under the Administrative Procedure Act and the Mineral Leasing Act. See Am. Pet. for Review of

To the extent consistent with applicable law, **the Secretary of the Interior shall pause new oil and natural gas leases on public lands** or in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters. The Secretary of the Interior shall complete that review in consultation with the Secretary of Agriculture, the Secretary of Commerce, through the National Oceanic and Atmospheric Administration, and the Secretary of Energy. In conducting this analysis, and to the extent consistent with applicable law, the Secretary of the Interior shall consider whether to adjust royalties associated with coal, oil, and gas resources extracted from public lands and offshore waters, or take other appropriate action, to account for corresponding climate costs.

86 Fed. Reg. at 7624-25 (emphasis added).[3] Subsequently, the Federal Defendants "paused" all quarterly lease sales of federal lands in North Dakota for oil and gas exploration in 2021 and 2022 except for one lease sale on June 30, 2022 (Q2 2022). See Doc. No. 74-2, p. 105 (detailing Q2 2022's lease sale results).

---

Final Agency Action, Wyoming v. U.S. Dep't of the Interior, No. 1:22-cv-00247, ECF No. 6 (D. Wyo. Dec. 1, 2022).

[3] Shortly before the EO, then-Acting Secretary of the Interior issued Secretarial Order 3395 on January 20, 2021. Secretary's Order No. 3395, Temporary Suspension of Delegated Authority, (Dep't of the Interior Jan. 20, 2021), https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3395-signed.pdf. This Secretarial Order temporarily suspended authority previously delegated to DOI's "Bureaus and Offices" and required them to obtain approval from the Secretary, Deputy Secretary, Solicitor, or certain Assistant Secretaries before taking various agency action. Id. For instance, no proposed or final agency action related to the National Environmental Policy Act could take place without approval by specific leadership. Id. The Department of the Interior extended the effect of S.O. 3395, and ensured lease sale notices, records of decisions, draft or final resource management plans, among other actions, first received approval from the Office of the Assistant Secretary for Land and Minerals Management. See Letter from Laura Daniel-Davis, Principal Deputy Assistant Secretary of Land and Minerals Management, to Bureau Directors (BLM, OSMRE, BSEE, BOEM), Confirmation of Matters for ASLM Review (Mar. 19, 2021). The Court takes judicial notice of the Federal Government's websites and documents mentioned herein pursuant to Federal Rule of Evidence 201 because facts stated within those websites and documents "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

[¶ 4]   The Mineral Leasing Act of 1920, as amended, 30 U.S.C. § 181, <u>et seq.</u> (the "MLA"), primarily frames the issues in this case. The MLA authorizes the Secretary to lease certain federal lands for oil and gas development, notably granting her broad discretion. <u>See</u> 30 U.S.C. § 226(a) ("All lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits *may* be leased by the Secretary." (emphasis added)). At the same time, the MLA commands "[l]ease sales *shall* be held for each State where eligible lands are available at least quarterly." <u>Id.</u> § 226(b)(1)(A) (emphasis added). <u>See</u> 43 C.F.R. § 3120.1-2(a) ("Each proper BLM State office *shall* hold sales at least quarterly if lands are available for competitive leasing." (emphasis added)). This congressional mandate is partly grounded in the MLA's purposes "to provide incentives to explore new, unproven oil and gas areas" and ensure the Federal Government is accordingly given adequate compensation. <u>Arkla Expl. Co. v. Tex. Oil & Gas Corp.</u>, 734 F.2d 347, 358 (8th Cir. 1984). <u>See also</u> <u>Mountain States Legal Found. v. Andrus</u>, 499 F. Supp. 383, 392 (D. Wyo. 1980) ("To withhold vast tracts of land from oil and gas leasing for the purpose of wilderness preservation is, to withdraw and withhold the lands from the purposes and operation of the Mineral Leasing Act."). The intersection of the Secretary's discretion to lease and the congressional mandate to hold quarterly lease sales is the heart of this case.

## I.   Relevant Processes for Leasing Federal Lands under the Mineral Leasing Act

[¶ 5]   There are certain steps that occur before federal lands are leased for oil and gas development. Courts have organized these steps into three phases. <u>See, e.g.</u>, <u>W. Energy All. v. Zinke</u>, 877 F.3d 1157, 1161 (10th Cir. 2017) (describing the three phases of oil and gas lease sales).

[¶ 6]    The first phase involves the Secretary, acting through BLM and the relevant surface management agency with jurisdiction over the lands ("SMA")[4], developing resource management plans ("RMPs") indicating which federal lands may be open to development within each state's borders. See 43 U.S.C. § 1712(a) ("The Secretary shall, with public involvement . . . . develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands."). RMPs must be drafted using "multiple use" management, which means a management style of stewarding "public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people." Id. § 1702(c). The development of an RMP triggers BLM or the relevant SMA to prepare an environmental impact statement ("EIS") in compliance with the National Environmental Protection Act ("NEPA"). 43 C.F.R. § 1601.0-6. The EIS and other relevant environmental documents (both in their drafting and final stages) are posted by BLM for a public comment period. Id. § 1610.2(e). Similarly, as BLM initiates, amends, or revises an RMP, it must "begin the process by publishing a notice in the *Federal Register*" for public comment. Id. § 1610.2(c) (italics added). BLM is also required to continue to invite public comments throughout the RMP planning process. Id. § 1610.2(a). See also 43 U.S.C. § 1712(a) ("The Secretary shall, with public involvement . . . develop, maintain, and, when appropriate, revise land use plans . . . ."). Once finalized, all activity on the federal land must comply and be consistent with the RMP. See Norton v. S. Utah Wilderness All., 542 U.S. 55, 69 (2004).

[¶ 7]    In the second phase, BLM State Offices (1) identify parcels they desire to offer for lease, if any, in the competitive quarterly sale process; and (2) if lands are otherwise available and

---

[4] BLM may sometimes be the SMA, but the primary SMAs in North Dakota are either the United States Forest Service or the United States Army Corps of Engineers. See Doc. No. 86, p. 10:4-16.

eligible and desired for leasing per the public, issue a formal sale notice notifying the public of the nominated parcels to be offered in the quarterly competitive bidding. See 43 C.F.R. § 3120.1-2(a) ("Each proper BLM State office shall hold sales at least quarterly if lands are available for competitive leasing."); see also W. Energy All., 877 F.3d at 1162. Importantly, the mandate to hold quarterly lease sales in each state is only triggered when lands are both "eligible" and "available." 30 U.S.C. § 226(b)(1)(A) ("Lease sales shall be held for each State where eligible lands are available at least quarterly[.]"). Neither "eligible" nor "available" is statutorily defined. Pursuant to BLM's Manual, lands are deemed "eligible" when they are identified in 43 C.F.R. § 3100.0-3 as being potentially open for leasing. BLM Manual MS-3120, Competitive Leases, subd. .11 (2013).[5] See also 30 U.S.C. § 226-3 (listing certain ineligible lands for oil and gas leasing). For example, BLM wilderness study areas are "ineligible" lands for oil and gas leasing. 43 C.F.R. § 3100.0-3(b)(2)(ix). BLM's Manual defines "available" land as parcels "open to leasing in the applicable resource management plan, and when all statutory requirements and reviews have been met, including compliance with [NEPA]." BLM Manual MS-3120, subd. .11.

[¶ 8]   BLM's Manual lists three avenues for nominating parcels so they may be included in the quarterly lease sales, but only one avenue is relevant here. First, there is a formal nomination procedure outlined in 43 C.F.R. §§ 3120.3-1 through 3120.3-7, which involves BLM publishing a formal notice in the *Federal Register*. BLM Manual MS-3120, subd. .31(A). BLM, however, is not currently using that process. Id. See 43 C.F.R. § 3120.3 ("The Director may elect to implement the provisions contained in §§ 3120.3-1 through 3120.3-7 . . . ."). Second, BLM may otherwise list lands "[o]n its own motion or action." 43 C.F.R. § 3120.31(B). Third, and relevant here, the

---

[5] Available at https://www.blm.gov/sites/blm.gov/files/uploads/mediacenter_blmpolicymanual3120.pdf.

public may submit an informal expression of interest ("EOI") regarding leasing an eligible and available parcel. Id. § 3120.1-1(e).

[¶ 9]   Lands nominated by the public via EOIs for inclusion in the quarterly lease sale are sent for review to the relevant SMA with jurisdiction over the federal land for approval to lease. See Wyo. Outdoor Council v. Bosworth, 284 F. Supp. 2d 81, 83 (D.D.C. 2003) (noting the "Forest Service and the BLM share responsibility for the issuance of leases on forest lands" and outlining eight steps for the leasing process). See, e.g., Doc. No. 69-1, p. 31 (informing nominator the EOI-requested lands could not be leased because the United States Army Corps of Engineers determined the "lands [were] not available for leasing at [that] time" due to a revision of the relevant RMP). Where, for instance, the SMA is the United States Forest Service ("USFS"), the USFS must "review the area or Forest-wide leasing decision" and "shall authorize [BLM] to offer [the] specific lands for lease." 36 C.F.R. § 228.102(e). USFS's authorization to BLM to lease the parcel, however, is subject to USFS "[v]erifying that oil and gas leasing of the specific lands has been adequately addressed in a NEPA document" and "is consistent with the Forest land and [RMP]," among other conditions. Id. § 228.102(e)(1). Once USFS or the relevant SMA consents to lease the land after verifying it meets NEPA and other required compliances (see, e.g., Doc. No. 93, p. 7 (labeling land at this stage "administratively available for leasing" (quoting 36 C.F.R. § 228.102(d)))), BLM must "review all [SMA] recommendations" and BLM "shall accept all reasonable recommendations of the [SMA]." 43 C.F.R. § 3101.7-2(c). See Ctr. for Biological Diversity v. U.S. Forest Serv., 444 F. Supp. 3d 832, 840-42 (S.D. Ohio 2020) (describing the back-and-forth between BLM and USFS in the leasing process).

[¶ 10]   On the other hand, where the SMA objects to or withholds statutory consent from leasing a parcel, BLM "shall not issue a lease and shall reject any lease offer" on that land. 43 C.F.R.

§ 3101.7-2(b). Assuming the SMA authorizes leasing on the parcel, verifies the land's statutory compliance, and BLM accepts the SMA's leasing recommendation, then the BLM State Office determines which of those "available" and "eligible" lands it desires to sell in the quarterly lease sale. See 30 U.S.C. § 226(a), (b)(1)(A). The MLA does not specify the number of "available" and "eligible" parcels that must be offered at a quarterly lease sale. Two things regarding lease sales, however, are clear: (1) BLM may not "stymie[]" bidders by including a "limited number of parcels" (Doc. No. 69-2, p. 9); and (2) where there are "available" and "eligible" lands, the quarterly lease sale must occur, see 30 U.S.C § 226(b)(1)(A); see also Doc. No. 86, pp. 14:23-15:12. The BLM State Office will then post a Notice of Competitive Lease Sale listing those chosen parcels (and links to their respective NEPA compliance documentation) typically 90 days prior to the auction date. BLM Manual MS-3120, subd. .52. See 30 U.S.C. § 226(f) (requiring the Secretary to give at least 45 days' notice before "offering lands for lease").

[¶ 11]   Following the posting, BLM's practice is to allow parties to protest any parcel's inclusion in the Notice of Competitive Lease Sale during a 30-day period. See W. Energy All., 877 F.3d at 1162. While an appeal or protest is pending, the authorized BLM officer "may suspend the offering of a specific parcel while considering a protest or appeal against its inclusion in a Notice of Competitive Lease Sale," but the entire lease sale is only allowed to be suspended if the Assistant Secretary for Land and Minerals Management determines "good and just cause" exists "after reviewing the reason(s) for an appeal." 43 C.F.R § 3120.1-3. The BLM Manual urges state offices to "resolve protests before the sale of the protested parcels" but unresolved protests "do not prevent bidding on protested parcels at the auction." BLM Manual MS-3120, subd. .53.

[¶ 12]  Finally, the third phase takes place after the lease is sold. At that time, BLM determines whether specific activities may occur on the leased parcel, such as whether BLM will approve oil drilling permits. See 30 U.S.C. § 226(g).

[¶ 13]  Proceeds from leasing federal lands for oil and gas development are split (for the most part) between the state where the drilling occurs and the Federal Government. Fifty percent of "sales, bonuses, royalties," and other revenues must be paid to the state in which the leased land is located (with exceptions for Alaska). 30 U.S.C. § 191(a). State legislatures may then direct those funds to areas "socially or economically impacted by [the] development of minerals." Id. Forty percent of the sales, bonuses, production royalties, and other revenues are directed to the Federal Reclamation Fund, which was created by the Reclamation Act to help maintain irrigation systems and hydropower projects in various states. Id.

## II.     Relevant Historical & Procedural Events Preceding North Dakota's Motion

### 1.     Pre-2021 Events Affecting 2021 Lease Sales in North Dakota

[¶ 14]  BLM faced some legal challenges in recent history to its oil and gas leasing decisions across the nation. See Doc. No. 22-1, pp. 1-2 (citing cases). More particularly, between 2018 and 2020, certain challenges were successful in proving BLM failed to adequately conduct NEPA analyses for leased parcels. Id. None of BLM's cited court challenges, however, found federal lands within North Dakota's borders were lacking robust NEPA analyses. Id. (noting one case, WildEarth Guardians v. U.S. Bureau of Land Management, 457 F. Supp. 3d 880 (D. Mont. 2020), involved 2017 and 2018 lease sales in the Montana-Dakotas region, but not identifying any parcels within North Dakota).

[¶ 15]  In May of 2020, BLM developed "its initial draft of the revised [greenhouse gas or 'GHG'] information that could be used to address the [NEPA] issue found" by a court in 2019. Doc. No.

44-2, p. 2. Several months later in November 2020, another court (while evaluating leases in Wyoming) apparently threw a wrench in BLM's plans by "urg[ing] BLM to conduct a robust [NEPA] analysis, using conservative estimates based on the best data, analyzed in an unrushed fashion, so that the analysis can effectively serve as a model for the other leases." WildEarth Guardians v. Bernhardt, 502 F. Supp. 3d 237, 259 n.16 (D.D.C. 2020). That November 2020 decision prompted "BLM [to] prepare[] an inventory of GHGs from fossil fuels produced on lands managed by the BLM in fiscal year 2020 and from reasonably foreseeable fossil fuel production and leasing over the next 12 months [in 2021]." Doc. No. 44-2, p 2.

[¶ 16]   Given the totality of (1) those adverse court decisions; (2) BLM's choice to "voluntar[ily] remand[]" in several litigation actions in order to reconsider its NEPA analysis; and (3) BLM's need to evaluate additional parcels for the then-ongoing quarterly lease sales across the nation, BLM experienced a backlog of NEPA analyses. Doc. No. 22-1, pp. 2-3.

## 2.   Q1 2021: No Quarterly Lease Sale in North Dakota

[¶ 17]   Around January 6, 2021, the "BLM air resources team" collaborated with and circulated to other BLM specialists and agencies the draft GHG report originally completed by the BLM air resources team in May of 2020. Doc. No. 44-2, p. 2 (noting final agency revisions to the GHG report were completed on or about October 12, 2021). As noted earlier, this GHG report was partially intended to alleviate BLM's NEPA litigation woes.

[¶ 18]   Three weeks later, on January 27, 2021, President Biden signed the EO. See Exec. Order No. 14008, 86 Fed. Reg. at 7624-25. That same day, BLM issued a "Fact Sheet" detailing how the DOI was "hitting pause on new oil and gas leasing" in order to "review the federal oil and gas

program to ensure that it serves the public interest and to restore balance on America's public lands."[6]

[¶ 19]  On February 12, 2021, the Acting Deputy Solicitor of the DOI issued a memorandum advising the Senior Advisor to the Secretary that the draft Environmental Assessments previously circulated for the then-upcoming Q1 2021 lease sales in North Dakota and other states "may be problematic in their evaluation of greenhouse gases" based on various courts in other states having remanded or vacated agency actions for failure to properly analyze GHG emissions (the "2021 DOI Memo"). Doc. No. 22-6, pp. 10-11 (citing Columbia Riverkeeper v. U.S. Army Corps of Eng'rs., No. 19-6071, 2020 WL 6874871, at *4 (W.D. Wash. Nov. 23, 2020), WildEarth Guardians, 502 F. Supp. 3d 237). The Acting Deputy Solicitor further said:

> Given the rapidly-evolving state of the law, the complex and novel challenges posed by greenhouse gas analysis, and the *truncated period of your review*, we advise you that there is a significant likelihood that analysis of the Colorado and Montana/Dakotas leases does not satisfy NEPA and is therefore vulnerable to litigation.

Id. at 11 (emphasis added). The Acting Deputy Solicitor concluded the 2021 DOI Memo by stating, "The parcels proposed for each of the above lease sale are not now 'eligible' and 'available' because, at a minimum, BLM has not completed its NEPA analysis." Id. A Senior Mineral Leasing Specialist within BLM later said, "In light of [the] growing accumulation" of NEPA analyses plus the several "adverse NEPA decisions [from courts], BLM postponed lease sales in the first quarter

---

[6] Press Release, Fact Sheet: President Biden to Take Action to Uphold Commitment to Restore Balance on Public Lands & Waters, Invest in Clean Energy Future, BUREAU OF LAND MGMT. (JAN. 27, 2021), https://www.blm.gov/press-release/fact-sheet-president-biden-take-action-uphold-commitment-restore-balance-public-lands.

of 2021 to do additional NEPA analysis." Doc. No. 22-1, p. 3. That is precisely what occurred—

BLM "postponed" North Dakota's Q1 2021 lease sale in originally scheduled for March 23, 2021.[7]

[¶ 20]   North Dakota was not the only state where federal leasing was "postponed." On March 24,

2021, thirteen states (but not North Dakota) filed a complaint against President Biden, a host of

Federal Government officials, and various federal agencies "asking for declaratory and injunctive

relief as to Section 208 of the [EO], which ordered the Secretary of the Interior to pause new oil

and gas leases on public lands[] . . . pending completion of a comprehensive review." Louisiana

v. Biden, 543 F. Supp. 3d 388, 396 (W.D. La. 2021), vacated, 45 F.4th 841 (5th Cir. 2022). The

plaintiff states argued the EO halted "new oil and gas leases on public lands and offshore waters

in violation of the United States Constitution," the Administrative Procedure Act, the MLA, and

the Outer Continental Shelf Lands Act. Id.

[¶ 21]   One day after the thirteen states sued, the Secretary publicly remarked on the federal oil

and gas leasing program and the EO: "The pause in new oil and gas lease sales gives us space to

look at the federal fossil fuel programs that haven't been meaningfully examined or modernized

in decades."[8]

### 3.   Q2 2021: No Quarterly Lease Sale in North Dakota

[¶ 22]   On March 1, 2021, an internal email among BLM and other DOI officials relayed:

> Department officials . . . are postponing further consideration of Quarter Two sales
> (including authorization of the sales) pending decisions on how the Department will
> implement the Executive Order on Tackling the Climate Crisis at Home and Abroad

---

[7]   See Montana-Dakotas Oil & Gas Lease Sales, BUREAU OF LAND
MGMT., https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-
sales/montana-dakotas (last visited Mar. 27, 2023).

[8] DOI News, Secretary Haaland Delivers Remarks at Interior's Public Forum on the Federal Oil
& Gas Program, U.S. DEP'T OF THE INTERIOR (Mar. 25, 2021), https://www.doi.gov/news/secret
ary-haaland-delivers-remarks-interiors-public-forum-federal-oil-and-gas-program.

> with respect to onshore sales.  The Department has not yet rendered any such decisions, but we hope to have further information in the coming weeks.  In the meantime, please post the following update on the relevant website(s): "The oil and gas lease sale scheduled for April, 2021 has been postponed."

Doc. No. 22-6, p. 17. Accordingly, back in North Dakota, on April 21, 2021, BLM's website stated BLM "exercis[ed] its discretion to not hold lease sales in the 2nd quarter of Calendar Year 2021" due to the "Interior Department's ongoing review of the federal oil and gas program['s] . . . compliance with applicable laws and, as directed by Executive Order 14008, reviewing whether the current leasing process provides taxpayers with a fair return."[9] See also Doc. No. 22-1, p. 4.

[¶ 23]  Despite a "postponement" in leasing, permits for drilling on already-leased federal lands continued to be "reviewed and approved."[10] The "postponement" or "pause" of the Q2 2021 sale was not for a lack of public interest in leasing federal lands.[11] Indeed, on January 19, 2021, BLM noted eleven of North Dakota's parcels received EOIs for Q2 2021 and were "posted on the BLM e-Planning website" with the relevant SMA's stipulations for leasing, thus, the parcels were open for comment.[12] These parcels, however, were never part of lease sales during 2021.

[¶ 24]  Returning to the thirteen states' litigation, the District Court for the Western District of Louisiana agreed with the plaintiff states and issued a nationwide preliminary injunction on June

---

[9] See Press Release, Statement on Second Quarter Oil & Gas Lease Sales, BUREAU OF LAND MGMT. (April 21, 2021), https://www.blm.gov/press-release/statement-second-quarter-oil-and-gas-lease-sales; see also Montana-Dakotas Oil & Gas Lease Sales, supra note 7.

[10] See Press Release, Statement on Second Quarter Oil & Gas Lease Sales, supra note 9.

[11] See BLM National NEPA Register: 2021 June Oil & Gas Lease Sale, BUREAU OF LAND MGMT. (Aug. 25, 2021, 10:06 AM), https://eplanning.blm.gov/eplanning-ui/project/2011450/510 (noting the Q2 2021 lease sale was "Paused" and linking various document).

[12] Letter from Donato Judice, Deputy State Director, Energy, Mineral & Realty, Bureau of Land Management, Interior Regions 5 & 9, Montana-Dakotas State Office (Jan. 19, 2021), https://eplanning.blm.gov/public_projects/2011450/200471913/20032756/250038955/01.19.2021%20Dear%20Reader%20Letter%20Scoping.pdf.

15, 2021 (the "2021 Louisiana Injunction"). <u>Louisiana</u>, 543 F. Supp. 3d at 419. That 2021 Louisiana Injunction enjoined and restrained:

> [T]he U.S. Department of the Interior, the United States Bureau of Land Management, the United States Bureau of Ocean Energy Management, and the United States Bureau of Safety and Environmental Enforcement, along with their directors, employees and Secretary . . . from implementing the Pause of new oil and natural gas leases on public lands or in offshore waters as set forth in Section 208 of [the EO] as to all eligible lands, both onshore, and offshore.

<u>Id.</u>

### 4. <u>Q3 2021: No Quarterly Lease Sale in North Dakota</u>

[¶ 25]  Despite being covered by the 2021 Louisiana Injunction (even though not a party to that litigation), North Dakota filed its original Complaint for Review of Final Agency Action with this Court on July 7, 2021. Doc. No. 1. The Complaint alleged, among other things, the Federal Defendants "failed to comply with [their] mandatory statutory duty" to hold oil and gas lease sales, as required by the MLA. <u>Id.</u> at p. 2. <u>See also</u> 30 U.S.C. § 226(b)(1)(A) ("Lease sales shall be held for each State where eligible lands are available at least quarterly[.]").

[¶ 26]  August 16, 2021, was the deadline for the Secretary to notice if she was going to offer lands for lease in North Dakota for Q3 2021, <u>see</u> 30 U.S.C. § 226(f), but no notice was given.

[¶ 27]  On August 23, 2021, North Dakota filed a Motion for Writ of Mandamus. Doc. No. 5. The State asked this Court to enter an order providing "immediate mandamus relief" and:

> [C]ompelling the Federal Defendants to comply with the preliminary injunction issued in the United States District Court for the District of Louisiana and their statutory duties under the Mineral Leasing Act ("MLA"), Federal Land Policy Management Act ("FLPMA"), National Environmental Policy Act ("NEPA"), and APA to hold the previously cancelled March, June, and September quarterly oil and gas lease sales, and hold all future lease sales until the Federal Defendants comply with the procedural process under the MLA, FLPMA, NEPA, and APA for modifying the North Dakota Resource Management Plan.

<u>Id.</u> While the Motion for Writ of Mandamus was pending, the Intervenors joined this litigation. <u>See</u> Doc. No. 31.

- 14 -

[¶ 28]   The following day, on August 24, 2021, the DOI issued a press release notifying the public it was appealing the 2021 Louisiana Injunction, but "[t]he federal onshore and offshore oil and gas leasing program will continue as required by the district court while the government's appeal is pending."[13] DOI further assured BLM "state offices will post for scoping parcels included in Quarter 1 and Quarter 2 2021 leasing deferrals by the end of August," and "BLM will undertake environmental reviews of parcels for potential leasing."[14]

[¶ 29]   The day after the press release was issued, BLM last updated its "National NEPA Register" website for the Q3 2021 lease sale.[15] There, BLM stated the "Project Status" of the Q3 2021 lease sale was "Paused" without apparent explanation, documentation, or opportunity for public comment.[16] On BLM's homepage for the Montana-Dakotas Oil and Gas Lease Sales, there is no mention of Q3 2021—no notice of BLM preparing for a sale in that quarter or the sale otherwise being "postponed," "paused," or "cancelled."[17] A few days later, on August 31, 2021, BLM tardily announced a "30 Day Public Comment period for feedback on parcels deferred from 2021 Quarter

---

[13] Press Release, Interior Department Files Court Brief Outlining Next Steps in Leasing Program, Press Releases, U.S. DEP'T OF THE INTERIOR (Aug. 24, 2021), https://www.doi.gov/pressreleases/interior-department-files-court-brief-outlining-next-steps-leasing-program.

[14] Id.

[15] BLM National NEPA Register: 2021 September Oil & Gas Competitive Lease Sale, BUREAU OF LAND MGMT. (Aug. 25, 2021, 3:53 PM), https://eplanning.blm.gov/eplanning-ui/project/2012969/510.

[16] Id.

[17] See Montana-Dakotas Oil & Gas Lease Sales, supra note 7 (failing to mention the Q3 2021 lease sale under the "2021 Lease Sales" tab).

1 and 2."[18] Again, the record is devoid of the public having access to a comment period or explanation for the "paused" Q3 2021 lease sale.[19]

### 5. Q4 2021: No Quarterly Lease Sale In North Dakota

[¶ 30]  On or about October 12, 2021, the BLM air resources team finished circulating its draft GHG report (which was a completed first draft in May of 2020). See Doc. No. 44-2. Once the air resources team incorporated input from BLM specialists and other agencies, "BLM revised the draft products and commenced final internal review with the various BLM State Offices." Id., p. 3. The final product was the 2020 BLM Specialist Report on Annual Greenhouse Gas Emissions and Climate Trends from Coal, Oil, and Gas Exploration and Development on the Federal Mineral Estate (BLM-Q3002462 - 002574) (the "2020 BLM Specialist Report"), which was released on October 29, 2021.[20] Id. This report specifically referenced the EO and how that order prompted BLM to "perform[] a comprehensive review of potential climate and other impacts from oil and natural gas development on public lands."[21]

---

[18] Montana-Dakotas Oil & Gas Lease Sales, supra note 7 (making the announcement under the "2021 Lease Sales" tab).

[19] The Court is cognizant the administrative record for this case is not yet complete, however, it is relevant that nothing appears on BLM's website regarding the postponement.

[20] Press Release, Bureau of Land Management Announces Next Steps, New Analyses for Upcoming Oil & Gas Lease Sales: Assessments Will Analyze Greenhouse Gas Emissions, Social Cost of Greenhouse Gases, BUREAU OF LAND MGMT. (Oct. 29, 2021), https://www.blm.gov/press-release/bureau-land-management-announces-next-steps-new-analyses-upcoming-oil-and-gas-lease. See also BUREAU OF LAND MGMT., 2020 BLM SPECIALIST REPORT ON ANNUAL GREENHOUSE GAS EMISSIONS AND CLIMATE TRENDS FROM COAL, OIL AND GAS EXPLORATION AND DEVELOPMENT ON THE FEDERAL MINERAL ESTATE (2021), https://www.blm.gov/content/ghg/.

[21] See 2020 BLM SPECIALIST REPORT, supra note 20.

[¶ 31]  Also on October 29, 2021, in anticipation of the then-upcoming Q1 2022 lease sale, BLM issued a public letter explaining its "proposed action [was] to lease 29 parcels within Miles City Field Office, North Dakota Field Office, U.S. Army Corps of Engineers, and Dakota Prairie Grasslands (USFS) areas."[22] BLM detailed it had already applied "surface use stipulations to the parcels" and "prepared an Environmental Assessment," so the Assessment and parcels were open to public comment.[23] Parcels among those proposed for potential inclusion in the Q1 2022 sale "included those that were deferred in the first and second quarters of 2021."[24]

[¶ 32]  Returning to the Q4 2021 lease sale in North Dakota, BLM was required to give public notice of its intent to offer lands for lease in that quarter by November 16, 2021, yet no notice was given. See 30 U.S.C. § 226(f) (requiring public notice at least 45 days before lease sales). Similar to what occurred in the prior quarter, BLM's formal "postponement" or "cancellation" of the Q4 2021 lease sale appears nowhere in the record. Indeed, BLM's website fails to mention any preparation for the Q4 2021 lease sale (scoping, draft environmental assessments, etc.).[25]

---

[22] Letter from Donato J. Judice, Deputy State Director, Energy, Mineral & Realty, Bureau of Land Management, Interior Regions 5 & 9, Montana-Dakotas State Office (Oct. 29, 2021), https://eplanning.blm.gov/public_projects/2015346/200495288/20048414/250054597/First%20Quarter%202022%20Dear%20Reader%20Letter%2030%20Day%20Comment%20Period.pdf.

[23] Id.

[24] See Press Release, BLM Opens Public Comment Period for First Quarter 2022 Lease Sale, Bureau of Land Management, BUREAU OF LAND MGMT. (Oct. 29, 2021), https://www.blm.gov/press-release/blm-opens-public-comment-period-first-quarter-2022-lease-sale.

[25] See Montana-Dakotas Oil & Gas Lease Sales, supra note 7 (failing to mention the Q4 2021 lease sale under the "2021 Lease Sales" or other tab).

### 6. <u>Q1 2022: No Quarterly Lease Sale in North Dakota</u>

[¶ 33]  Returning to the litigation before this Court, on January 14, 2022, this Court denied the State's Motion for Writ of Mandamus without prejudice. Doc. No. 38. Although the State argued the Court should enforce the 2021 Louisiana Injunction because the Federal Defendants were failing to comply by not holding oil and gas lease sales in North Dakota in 2021, this Court was unable to grant such relief because it was not the injunction-issuing court. <u>Id.</u> However, this Court said, "If that Injunction gets modified to remove the national character or overturned on appeal, North Dakota may bring an independent motion for preliminary injunction in this case for the Court's review." <u>Id.</u> at p. 5. As for the State's request for immediate mandamus relief, this Court found "consideration of [such] arguments should occur only after full briefing on the merits with the full administrative record." <u>Id.</u> at pp. 5-6. Indeed, the Court highlighted mandamus relief was not "particularly necessary" because the Federal Defendants gave the "Court assurances at the hearing [that] the process to start Federal oil and gas leasing sales in North Dakota was imminent." <u>Id.</u> at p. 9. Following the Court's denial of mandamus relief, the Parties began the process of completing the administrative record. <u>See, e.g.</u>, Doc. Nos. 40, 45, 48.

[¶ 34]  Despite (1) the Federal Defendants assuring this Court in September of 2021 they were "preparing for a lease sale to be held in the first quarter of 2022" (Doc. No. 22-1, p. 6); (2) again telling this Court in January of 2022 an oil and gas lease sale in North Dakota "was imminent" (Doc. No. 38, p. 9); (3) BLM issuing a notice in October 2021 that 29 parcels in North Dakota were nominated for a Q1 2022 lease sale (but not issuing a formal Notice of Competitive Lease Sale); and (4) BLM noting it was opening those parcels for public comment in October 2021

because BLM had completed the initial stipulations and Environmental Assessments,[26] no sale

occurred in Q1 2022. Again, BLM's website fails to explain why the Q1 2022 lease sale was

cancelled.[27] Instead, the link offered under the "First Quarter" 2022 lease sales directs the reader

to Q2 2022.[28]

[¶ 35]   BLM now explains the reason for not holding the Q1 2022 lease sale is because the District

Court for the Western District of Louisiana issued a preliminary injunction on February 11, 2022,

enjoining the DOI from relying upon NEPA analyses that accounted for "any and all Social Cost

of Greenhouse Gas estimates" (the "GHG Louisiana Injunction"). Doc. No. 74, p. 19; 39, pp. 3-4

(quoting Louisiana v. Biden, 585 F. Supp. 3d 840, 852, 870 (W.D. La. 2022)). Notably, North

Dakota was not a party to this Louisiana suit and the GHG Louisiana Injunction does not mention

it applies nationwide (unlike the 2021 Louisiana Injunction). See Louisiana, 585 F. Supp. 3d at

840, 870. Also importantly, the GHG Louisiana Injunction was issued just days before BLM was

required to publish the formal Notice of Competitive Lease Sale in North Dakota. Id. See 30 U.S.C.

§ 226(f) (requiring at least 45 days' notice before the sale); see also Doc. No. 86, p. 87:2-17

(explaining no notice of lease sale was issued given the GHG Louisiana Injunction). According to

---

[26] Letter from Donato J. Judice, Deputy State Director, Energy, Mineral & Realty, Bureau of Land Management, Interior Regions 5 & 9, Montana-Dakotas State Office, supra note 22. See also BUREAU OF LAND MGMT., ENVIRONMENTAL ASSESSMENT: FIRST QUARTER 2022 OIL & GAS LEASE PARCEL SALE, DOI-BLM-MT-0000-2021-0006-EA (2021), https://eplanning.blm.gov/public_projects/2015346/200495288/20048424/250054607/First%20Q uarter%202022%20Lease%20Sale%20EA%20for%20public%20comment%20DRAFT%2009.1 5.21.pdf.

[27] See Montana-Dakotas Oil & Gas Lease Sales, supra note 7 (noting BLM "experienced technical issues during the current comment period" on the anticipated Q1 2022 lease sale in North Dakota, but failing to offer an explanation as to its non-occurrence under the "2022 Lease Sales" tab).

[28] Id. (linking to https://eplanning.blm.gov/eplanning-ui/project/2015346/510, which contains documents for the June 2022 lease sale).

the Federal Defendants, their NEPA analyses for the parcels in the anticipated Q1 2022 lease sale were based on those "Social Cost" estimates, so they had to be redone and could not be completed prior to the Q1 2022 deadline. See Doc. No. 74, pp. 19-20. The Federal Defendants represent the GHG Louisiana Injunction "essentially halted" BLM's scoping process for future sales. Id. at p. 20.

### 7. Q2 2022: First Quarterly Lease Sale in North Dakota Occurs Since EO

[¶ 36]   Despite representing the GHG Louisiana Injunction "halted" lease sales (see id.), on April 15, 2022, the DOI issued a press release announcing it was "compl[ying] with an injunction from the Western District of Louisiana" and implementing a "balanced approach to energy development and management of our nation's public lands," which would result in BLM issuing a Notice of Competitive Lease Sale.[29]

[¶ 37]   On June 30, 2022 (Q2 2022), BLM held its first oil and gas lease sale in North Dakota since the EO's promulgation. See Doc. No. 74, pp. 19-20.

### 8. Q3 2022: No Quarterly Lease Sale in North Dakota

[¶ 38]   On August 16, 2022, President Biden signed into law the Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 (the "IRA"). Notably, the IRA required new EOIs to be submitted with a fee and conditioned certain renewable energy development on the Secretary holding oil and gas lease sales under 30 U.S.C. § 226, during which she must offer 2,000,000 acres

---

[29] Press Release, Interior Department Announces Significantly Reformed Onshore Oil & Gas Lease Sales: Lease Sales to Focus on Highest & Best Use of America's Public Lands, Reflecting an 80 Percent Reduction from Nominated Acreage, U.S. DEP'T OF THE INTERIOR (April 15, 2022), https://www.doi.gov/pressreleases/interior-department-announces-significantly-reformed-onshore-oil-and-gas-lease-sales.

plus 50% of acres requested via EOIs that were submitted for the relevant period. IRA § 2061, 43 U.S.C. § 3006(a)(3), (b)(1).

[¶ 39]  The statutory deadline for noticing whether the Federal Defendants were going to offer lands for lease in North Dakota for Q3 2022 was the same day President Biden signed the IRA. See 30 U.S.C. § 226(f). In other words, no Notice of Competitive Lease Sale was issued.

[¶ 40]  The following day, on August 17, 2022, the United States Court of Appeals for the Fifth Circuit vacated and remanded the nationwide 2021 Louisiana Injunction for its failure to specifically state what it was enjoining. See Louisiana v. Biden, 45 F.4th 841, 843 (5th Cir. 2022). Just one day later, however, on August 18, 2022, the District Court for the Western District of Louisiana instead issued a permanent injunction with added particularity (the "Louisiana Permanent Injunction"). See Louisiana v. Biden, No. 2:21-CV-00778, 2022 WL 3570933 (W.D. La. Aug. 18, 2022). Rather than having a nationwide scope, the Louisiana Permanent Injunction applied only to the thirteen plaintiff states (not North Dakota) and enjoined the Federal Government defendants "from implementing a Stop, referred to in [the EO] as a Pause, on new oil and gas leases on public lands and in offshore waters, as set forth in Section 208 of [the EO], as to all 'eligible' lands both onshore and offshore." Id. at *20.

[¶ 41]  Even with the passage of the IRA and the injunction change in Louisiana, no Q3 2022 lease sale activity or other related actions are listed on the BLM Montana-Dakotas website.[30] In fact, the latest entry on that website related to 2022 has to do with the June 2022 lease sale—there is not even a notice of a "postponed" Q3 2022 lease sale.[31] The Federal Defendants here represent no

---

[30] See Montana-Dakotas Oil & Gas Lease Sales, supra note 7 (noting BLM held a sale in June 2022 but making no mention of Q3 or Q4 of 2022).

[31] Id.

sales took place in Q3 2022 because BLM needed time "to evaluate the impacts" of the newly-enacted IRA. Doc. No. 74, p. 20. In fact, the Federal Defendants told this Court they were unaware of "any determinations of availability that have gone forward" in North Dakota since August 16, 2022 (i.e., the enactment date of the IRA). Doc. No. 86, p. 98:22-24.

### 9.  Q4 2022: No Quarterly Lease Sale in North Dakota

[¶ 42]   BLM did not notice any Q4 2022 sale or list anything related to that quarter on its Montana-Dakotas website.[32] Nevertheless, the Federal Defendants have again assured this Court BLM began scoping for the 2023 lease sales "in October 2022," but no lease sale activity took place in Q4 2022 due to BLM needing more time to analyze the IRA. Doc. No. 74, p 20. See also Doc. No. 86, p. 98:22-24 ("There have not been any determinations of availability that have gone forward [between August 16, 2022, and Q4 2022] to my knowledge in North Dakota."). President Biden seems to have confirmed the failure to engage in oil and gas lease sales in Q4 2022, stating on November 7, 2022, "No more drilling. There is no more drilling. I haven't formed any new drilling."[33]

[¶ 43]   Also on November 7, 2022, in the case before this Court, the State filed an unopposed Motion to Stay Case Deadlines for sixty (60) days so that North Dakota could "evaluate subsequent lease cancellations by the [Federal] Defendants and their relation to this case." Doc. No. 57. The Court granted the State's motion and ordered a status report regarding North Dakota's intentions by January 9, 2023. Doc. No. 59.

---

[32] See id. (mentioning nothing related to Q4 of 2022).

[33] David Blackmon, Biden Promises 'No More Drilling' Just Days after Demanding More Drilling, FORBES (Nov. 7, 2022, 6:48 AM), https://www.forbes.com/sites/davidblackmon/2022/11/07/biden-promises-no-more-drilling-just-days-after-demanding-more-drilling/?sh=4086f79478e7.

[¶ 44]  North Dakota has represented approximately 875 parcels within the State were nominated via EOIs for leasing for 2021 and beyond, 177 of which successfully completed the relevant SMA, BLM, and NEPA reviews before Q1 2021. Doc. No. 95, p. 3. <u>See also</u> Doc. No. 86, p. 16:11-25. The Federal Defendants disagree with that assertion. <u>See</u> Doc. No. 74, p. 46. <u>See also</u> Doc. No. 90 ¶ 45 (denying the allegations of paragraph 45 of the Complaint relating to the number of parcels administratively available for leasing). At the hearing on North Dakota's Motion, the Federal Defendants and Intervenors noted a small number of those parcels had been included in the Q2 2022 lease sale. <u>See</u> Doc. No. 86, pp. 71:14-74:16.

### 10. Q1 2023: No Quarterly Lease Sales in North Dakota & New Lawsuit

[¶ 45]  Although the scope of this case does not embrace Q1 2023, that quarter is relevant to the analysis below to the extent that BLM has not noticed and will not be having a Q1 2023 lease sale in North Dakota.[34] The Federal Defendants represented to this Court that, given the numerous parcels under consideration and the newly-implemented IRA, BLM simply needed "more time" to hold a lease sale. Doc. No. 86, p. 101:12.

[¶ 46]  On January 5, 2023, the State initiated a new case (Case No. 1:23-cv-00004) and filed a new complaint against the Federal Defendants alleging they unlawfully cancelled quarterly oil and gas lease sales in North Dakota in Q3 2021, Q4 2021, Q1 2022, Q3 2022, and Q4 2022—i.e., all quarters where no lease sales occurred after the State's original complaint was filed. <u>See</u> <u>Complaint</u>, ECF No. 1, <u>North Dakota v. U.S. Dep't of Interior</u>, No. 1:23-cv-00004 (D.N.D. Jan. 5, 2023). On January 9, 2023, North Dakota filed a Motion for Preliminary Injunction in its new

---

[34] Although Q1 2023 saw no lease sale in North Dakota, <u>see</u> <u>Montana-Dakotas Oil & Gas Lease Sales</u>, <u>supra</u> note 7 (mentioning nothing related to Q1 2023), the Federal Defendants have represented they intend to hold a lease sale in Q2 2023 in North Dakota, <u>see, e.g.</u>, Doc. No. 74-2, p. 78 (describing parcels and proposed stipulations for a June 27, 2023 lease sale).

action, seeking an order: (1) "Declaring the Federal Defendants['] actions of cancelling quarterly lease sales are unlawful;" (2) Enjoining and restraining the Federal Defendants under 5 U.S.C. 706(1) and 5 U.S.C. 705 from unlawfully cancelling future quarterly lease sales;" and (3) "Compelling the Federal Defendants under 5 U.S.C. 706(1) to hold the previously cancelled quarterly lease sales for 'available' lands." See Mot. for Prelim. Inj., North Dakota v. U.S. Dep't of Interior, No. 1:23-cv-00004, ECF No. 9 (D.N.D. Jan. 9, 2023).

[¶ 47]  Also on January 9, 2023, North Dakota filed a status report in its original case. See Doc. No. 60. There, North Dakota noted its new complaint was a separate challenge from its original action because the State was contesting "subsequent cancellations of quarterly lease sales in 2021 and 2022 in North Dakota that occurred *after* North Dakota's complaint in this action was filed on July 7, 2021." Id. at p. 2. Given the new challenge, North Dakota requested continuing the stay in its original case and suggested the Court consolidate its two challenges after its new Motion for Preliminary Injunction was resolved. Id. at pp. 2-3. Prior to the resolving the Motion, however, the Court consolidated the two cases. See Doc. Nos. 62, 67. Accordingly, the unresolved Motion for Preliminary Injunction merged into the original matter and is now before this Court. See Doc. No. 68. In that Motion, North Dakota argues a preliminary injunction is warranted, in part, because the Federal Defendants' "pause" or "cancellation" of new oil and gas lease sales irreparably harms the State's sovereign, economic, and procedural interests and violates the MLA, the Federal Land Policy and Management Act ("FLPMA"), and the Administrative Procedure Act ("APA"). Id.

## ANALYSIS

### I.     North Dakota Has Standing to Bring its Action

[¶ 48]  North Dakota asserts it has standing to challenge the "postponement" or "cancellation" of the 2021 and 2022 quarterly lease sales of federal land within its borders. See Doc. No. 69, pp. 5-

7. Neither the Federal Defendants nor the Intervenors directly challenge North Dakota's position that it has constitutional standing. <u>See</u> Doc. Nos. 73, 74. The Court finds no reason to disturb the unchallenged assertion.

[¶ 49]  Article III standing requires the plaintiff prove: (1) "it has suffered a concrete and particularized injury that is either actual or imminent"; (2) "the injury is fairly traceable to the defendant"; and (3) there is a likelihood "that a favorable decision will redress that [alleged] injury." <u>Massachusetts v. EPA</u>, 549 U.S. 497, 517 (2007). Where, however, Congress gave the plaintiff a "vested . . . procedural right," such as the "right to challenge agency action unlawfully withheld," the plaintiff may have standing without having to meet "all the normal standards for redressability and immediacy." <u>Id.</u> at 517-18. In such an instance, constitutional standing exists if "there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." <u>Iowa League of Cities v. EPA</u>, 711 F.3d 844, 871 (8th Cir. 2013) (quoting <u>Massachusetts</u>, 549 U.S. at 518).

[¶ 50]  North Dakota alleges its sovereign, economic, and procedural rights have been harmed as a direct result of the Federal Defendants' failure to follow their mandate to timely conduct certain analyses in order to hold quarterly lease sales pursuant to 30 U.S.C. § 226 and their failure to hold public notice and comment regarding withdrawing public lands from their permissible uses identified in their respective RMPs, in violation of 43 U.S.C. § 1714(a). Here, North Dakota has sufficiently demonstrated it is the "subject of agency action" allegedly withheld and unlawfully taken, its economic and sovereign injuries are traceable to the Federal Defendants' actions, and "there is some possibility" the relief requested will cause the Federal Defendants to timely make its leasing decisions in North Dakota and follow public notice and comment procedures for

withdrawing public lands. Iowa League of Cities, 711 F.3d at 871. Accordingly, North Dakota may proceed because it has constitutional standing to bring this action.

[¶ 51]  North Dakota also has statutory standing to bring its Motion. See Miller v. Redwood Toxicology Lab'y, Inc., 688 F.3d 928, 934 (8th Cir. 2012) ("When a plaintiff alleges injury to rights conferred by statute, two separate standing-related inquiries are implicated: whether the plaintiff has Article III standing (constitutional standing) and whether the statute gives that plaintiff authority to sue (statutory standing)."). Again, the Federal Defendants and the Intervenors do not argue North Dakota lacks statutory standing.

[¶ 52]  Statutory standing is not jurisdictional, but a question of whether the enacted law encompasses the plaintiff's challenge. See Lexmark Int'l, Inc. v. Status Control Components, Inc., 572 U.S. 118, 128 n.4 (2014). Courts "presume that a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." Magdy v. I.C. Sys., Inc., 47 F.4th 884, 887 (8th Cir. 2022) (internal quotation marks omitted) (quoting Lexmark Int'l, Inc., 572 U.S. at 129). This "zone-of-interests test" requires courts to employ "traditional tools of statutory interpretation" to evaluate whether Congress' creation of a statutory cause of action embraces the plaintiff's claim. Id. at 887-88 (quoting Lexmark Int'l, Inc., 572 U.S. at 127). The test is not "especially demanding" in the APA context. Lexmark Int'l, Inc., 572 U.S. at 130 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012)).

[¶ 53]  Congress, by enacting the APA, provided plaintiffs like North Dakota with a cause of action to seek relief from federal agencies' alleged wrongs. 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof."); id. § 706 (authorizing the reviewing court to, among other

things "compel agency action unlawfully withheld or unreasonably delayed"). North Dakota has alleged the Federal Defendants have undertaken unlawful "agency action" by "fail[ing] to act" according to their mandatory duties. 5 U.S.C. § 551(13). Accordingly, North Dakota's action falls within the "zone of interests" under the APA.

## II.    The "Postponement" or "Cancellation" of Each Quarter's Lease Sale in North Dakota is a "Final Agency Action" Subject to Review under the APA

[¶ 54]   Although the Federal Defendants and Intervenors' arguments focus on (1) proving the Federal Defendants did not violate any mandatory duty, and (2) asserting the Court cannot issue North Dakota's desired relief, they also allude the decisions to "postpone or not hold lease sales" were not "final agency action[s]" this Court may review under the APA. Doc. No. 74, p. 39. <u>See also</u> Doc. No. 73, p. 7 n.5. North Dakota, however, asserts the "cancellation of each statutorily mandated quarterly lease sale challenged" constitute "final agency actions." Doc. No. 69, p. 6. The Court agrees with North Dakota.

[¶ 55]   The APA only permits courts to review final agency actions. <u>See</u> 5 U.S.C. § 704 (noting only "final agency action" is reviewable). The Federal Defendants are undoubtedly comprised of "agencies." <u>See</u> 51 U.S.C. § 551(1) (defining "agency" as "each authority of the Government of the United States" with exceptions inapplicable here). An "agency action" includes the agency's "failure to act." 5 U.S.C. § 551(13). A "failure to act" encompasses an agency's "omission of an action without formally rejecting a request," such as failing to "take some decision by a statutory deadline." <u>Norton</u>, 542 U.S. at 63. When a litigant asserts a claim under 5 U.S.C. § 706(1) and requests the court to "compel agency action unlawfully withheld or unreasonably delayed," that claim about the agency's alleged failure to act may "proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" <u>Org. for Competitive Mkts. v. U.S. Dep't of Agric.</u>, 912 F.3d 455, 462 (8th Cir. 2018) (quoting <u>Norton</u>, 542 U.S. at 64).

For instance, a litigant's desire to make "*wholesale* improvement" to an agency's program is not a challenge to an "agency action" because it is not "discrete." Norton, 542 U.S. at 64 (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 891 (1990)).

[¶ 56]  Where the litigant challenges a discrete, mandatory agency action, the agency's action becomes "final" pursuant to a two-part test. See Bennett v. Spear, 520 U.S. 154, 177-78 (1997). First, the agency's action "must not be of a merely tentative or interlocutory nature," and second, the "action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Hawkes Co., Inc. v. U.S. Army Corps of Eng'rs, 782 F.3d 994, 999 (8th Cir. 2015) (quoting Bennett, 520 U.S. at 177-78). Even if there is "final agency action," the Court is unable to review "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

## 1.   **The Federal Defendants' Actions Were "Final" Agency Actions**

[¶ 57]  The Federal Defendants' decisions to "postpone" (i.e., cancel) the seven quarterly lease sales in North Dakota during 2021 and 2022 are "final" agency actions. See Bennett, 520 U.S. at 177-78 (explaining "final" agency action is not tentative or interlocutory, and must have some legal consequence). There is nothing interlocutory or tentative about the "pause" or "postponement" of the seven forgone lease sales. Even though the Federal Defendants employ the terms "pause" or "postpone," which connote a pending status, the reality is the seven lease sales never occurred—they were cancelled, whether formally or informally, and cannot resume. Time waits for no one, or, in this case, no lease sale. As another court noted, a "'final agency action' does not have to be defined as permanent to be considered final." Louisiana, 2022 WL 3570933, at *14 (citing cases). The Court concludes the Federal Defendants' cancellations meet the first

prong of the <u>Bennett</u> test. <u>See</u> <u>Bennett</u>, 520 U.S. at 177-78 (explaining "final" agency action cannot be tentative or interlocutory).

[¶ 58]   Additionally, where no quarterly lease sale occurs, legal determinations consequently have been made that no federal lands were "available" and/or "eligible" for leasing. <u>See</u> 30 U.S.C. § 226(b)(1)(A). Here, the Federal Defendants' cancellations effectively made those determinations over the course of seven quarters, thereby telling North Dakota it had no right to have federal lands leased within its borders. This is sufficient to satisfy the second and final prong of the <u>Bennett</u> test. <u>See</u> <u>Bennett</u>, 520 U.S. at 177-78 (stating the second prong of "final agency action" requires "rights or obligations [to] have been determined" or otherwise "legal consequences" flowed from the alleged agency action). Accordingly, the Court finds the Federal Defendants' cancellation of the seven lease sales in North Dakota during 2021 and 2022 were "final" agency actions.

### 2.   The "Postponements" of the Seven Quarterly Lease Sales During 2021 & 2022 Were Not Agency Actions Committed to the Secretary's Discretion under the APA or MLA

[¶ 59]   The Federal Defendants' decisions to "postpone" (i.e., cancel) seven out of the eight quarterly lease sales during 2021 and 2022 in North Dakota are not agency actions committed to the Secretary's discretion—they are discrete, mandatory, and final agency actions subject to this Court's review. 5 U.S.C. § 704. To analyze the discrete and non-discretionary nature of the agency action under the APA, the Court must assess Congress' directions to the Secretary in the MLA. Having reviewed the relevant law, the Court concludes the Secretary's discretionary decision to pick which Federal lands to lease under 30 U.S.C. § 226(a) is distinct from (1) the Federal Defendants' requirement to timely complete the statutory analyses for determining which lands are "eligible" and "available" for leasing; and (2) the statutory mandate to hold a quarterly lease sale "for each State where eligible lands are available at least quarterly," 30 U.S.C. § 226(b)(1)(A).

The Court concludes the Federal Defendants' attempt to force their required actions under the umbrella of the Secretary's discretion is distinct from the Secretary's mandated conduct under 30 U.S.C. § 226(b). See, e.g., Doc. No. 74-1, p. 2 (arguing "BLM [has] wide discretion to hold . . . lease sales").

[¶ 60]  Section 226(b)(1)(A)'s congressional charge that BLM "shall" hold lease sales "at least quarterly" where "eligible lands are available" is not overshadowed by the Secretary's discretion for several reasons. First, Congress' carefully chosen language of "shall" dispels the Federal Defendants' discretion to hold a lease sale where at least one parcel is "eligible" and "available" (a reality the Federal Defendants have recognized as far back as 1989 (see Doc. No. 69-2, pp. 9-10)). Second, the rule against superfluity dictates Congress did not draft § 226(b)(1)(A) as an afterthought. Third, Congress clearly purposed lease sales to occur without the Secretary discretionarily doing away with them. Fourth, other courts have confirmed oil and gas leasing pursuant to § 226 contains both discretionary and mandatory actions, the latter of which is subject to judicial review. See, e.g., Louisiana, 2022 WL 3570933, at *15 ("The discretion to stop the lease process for eligible lands is not within the discretion of the agency by law under the . . . MLA."); W. Energy All. v. Jewell, No. 1:16-CV-00912, 2017 WL 3600740, at *13 (D.N.M. Jan. 13, 2017) ("The Court agrees . . . that requesting BLM [to] conduct quarterly leases of eligible and available parcels is not a programmatic challenge, but a request that this Court enforce a discrete, non-discretionary duty contained in a single statutory provision[] . . . .").

[¶ 61]  Congress clearly meant for some mandatory agency action to occur when it said "[l]lease sales *shall* be held." 30 U.S.C. § 226(b)(1)(A) (emphasis added). Congress drafts statutes with particularity, so when it "distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty." Me. Cmty. Health Options v. United States, 590 U.S. ____, 140 S. Ct.

1308, 1321 (2020) (quoting Kingdomware Techs., Inc. v. United States, 579 U.S. 162, 172 (2016)). Surveying 30 U.S.C. § 226, Congress juxtaposed the Secretary's discretionary decision about which available and eligible lands to lease in § 226(a) ("All lands subject to disposition . . . *may* be leased . . . ." (emphasis added)), with the mandate in § 226(b)(1)(A) that lease sales "*shall* be held . . . at least quarterly" when eligible lands are "available" (id. (emphasis added)). See Impact Energy Res., LLC v. Salazar, Nos. 2:09-CV-435, 2:09-CV-440, 2010 WL 3489544 (D. Utah Sept. 1, 2010) ("When taken into consideration with §§ 226(b)(1)(A) and 226(c), it becomes clear that the permissive 'may' language of § 226(a) is limited, and refers only to pre-sale decisions about whether or not to offer a parcel of land in a lease sale."). Both this Court and the Federal Defendants must heed Congress' instruction. Indeed, they recognized their duty to timely analyze lands and hold quarterly lease sales is mandatory as far back as 1989, when DOI issued a memorandum (the "1989 DOI Memo") stating (1) "Congress did not intend to give the Secretary any discretion" in holding quarterly lease sales where "eligible lands are available for leasing"; and (2) DOI had the congressionally-mandated "responsibility to plan the activities necessary to have eligible lands available for sale" in accordance with timeframe § 226(b)(1)(A). Doc. No. 69-2, pp. 9-10.

[¶ 62]  To allow mandatory agency action in § 226(b)(1)(A) to be subsumed by the Secretary's discretion in § 226(a) would run contrary to the rule against superfluities. That rule instructs courts to interpret a statute so all provisions are given effect—so none are rendered superfluous or inoperative. See Hibbs v. Winn, 542 U.S. 88, 101 (2004). Congress drafted these two distinct sections, one with discretion, one without. Compare 30 U.S.C. § 226(a), with id. § 226(b)(1)(A). In deference to Congress' plan, this Court must recognize the Federal Defendants have mandatory duties with deadlines: they must make preparations, analyze, and make determinations regarding whether nominated lands in each state are "eligible" and "available" for leasing in time for the

- 31 -

related quarterly sale deadlines. Id. § 226(b)(1)(A). See, e.g., id. § 226(f) (requiring at least 45 days' notice before offering lands for lease). Failure to complete those duties on the statutory timetable due to "Secretarial discretion" would mush § 226(b)(1)(A) and § 226(a) together, effectively telling Congress it mistakenly drafted two distinct statutory subsections. This Court must respect Congress' drafting and may review the non-discretionary and discrete agency action in § 226(b)(1)(A). See Forest Guardians v. Babbitt, 174 F.3d 1178, 1190 (10th Cir. 1999) ("[W]hen an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action and courts, upon proper application, must compel the agency to act.").

[¶ 63]  To find the Federal Defendants' actions were merely an exercise of the Secretary's discretion under § 226(a) would also ignore Congress' purpose in enacting the MLA and plan for its execution. Congress drafted that statute "to *provide incentives* to explore new, unproven oil and gas areas" while also assuring "adequate compensation to the government for leasing in producing areas" through the competitive bidding process. Arkla Expl. Co., 734 F.2d at 358 (emphasis added). See also Mineral Leasing Act of 1920, 66 Cong. 2d Sess., Ch. 85, 41 Stat. 437 (codified as amended 30 U.S.C. § 181 et seq.) (specifying in its subtitle the MLA was enacted "[t]o promote the mining of coal, phosphate, oil, oil shale, gas, and sodium on the public domain"). The legislative history further confirms providing incentives for oil and gas exploration and conducting quarterly lease sales were not optional actions left to the Secretary's discretion. One proposed bill from the House of Representatives offered during the 1987 amendments to the MLA suggested including a provision stating the Secretary "shall hold competitive oil and gas lease sales on a quarterly basis *except* that the Secretary *may suspend or postpone lease sales if [she] determines that such suspension or postponement best serves the interests of the United States*." A Bill to

Establish Competitive Oil and Gas Leasing and Modify Leasing Procedures for Onshore Federal Lands, H.R. 933, 100th Cong. (1987) (emphases added). Rather than add that proposed language, Congress instead amended the MLA to include what is now the relevant language from 30 U.S.C. § 226(b)(1)(A): "Lease sales shall be held for each State where eligible lands are available at least quarterly[.]" Federal Onshore Oil and Gas Leasing Reform Act of 1987, Pub. L. No. 100-203, § 5102, 101 Stat. 1330. The exclusion of H.R. 933 and the addition of § 226(b)(1)(A) shows Congress separated the Secretary's discretion in § 226(a) from (1) agencies conducting necessary activities to determine if lands are "eligible" and "available" on a timely basis; and (2) ultimately, from the requirement to lease at least some "eligible" and "available" parcels where such lands exist.[35]

[¶ 64] This is not the first court to find judicial review is appropriate where the plaintiff "request[s] BLM [to] conduct quarterly leases of eligible and available parcels" because such a request is seeking to "enforce a discrete, non-discretionary duty" rather than actions committed to the Secretary's discretion. W. Energy All., 2017 WL 3600740, at *13. See also Louisiana, 2022 WL 3570933, at *10 ("Plaintiff States['] challenge . . . is a challenge to specific things—the Government Defendants' agencies' cancellation and/or postponement of eligible onshore . . . oil and gas leases . . . .").

---

[35] The Intervenors have suggested BLM could "split its currently planned June 2023 sale into four smaller sales" and be "fully consistent" with the MLA without increasing the number of leases issued during all of 2023 or completing other parcels' reviews. Doc. No. 73, p. 17. The Court cautions against such an approach to leasing because the DOI itself has said it cannot "stymie[]" bidders by including a "limited number of parcels" in a lease sale. Doc. No. 69-2, p. 9. Not to mention, Congress drafted the MLA to "provide incentives" for oil and gas leasing—not hamper it. Arkla Expl. Co., 734 F.2d at 358.

### 3.   The Incomplete Administrative Record Does Not Preclude Judicial Review

[¶ 65]  As a final threshold matter before moving onto the merits, the Federal Defendants and Intervenors contend the Motion is premature because the administrative record is not fully developed. North Dakota argues having a competed administrative record is not a prerequisite to seeking a preliminary injunction as a remedy for an agency's illegal actions. The Court agrees with North Dakota.

[¶ 66]  The APA authorizes this Court to "issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Indeed, courts may preserve parties' statuses and rights by issuing preliminary injunctions without a complete administrative record. See, e.g., Coteau Props. Co. v. Dep't of Interior, 53 F.3d 1466, 1481 (8th Cir. 1995) (holding the district court abused its discretion in denying the motion for preliminary injunction even though the "full administrative record was never filed"); Cook Cnty. v. Wolf, 962 F.3d 208, 221, 234 (7th Cir. 2020) (affirming the district court's order entering a preliminary injunction even though the "litigation [was] still in an early stage and anything [the court said could] change as the record develop[ed] further"). The Court finds completing the administrative record is not necessary before considering the Motion for Preliminary Injunction. Such a potential remedy is, indeed, "preliminary" and not the final word.

### III.   North Dakota Is Entitled to a Preliminary Injunction

[¶ 67]  A preliminary injunction under Federal Rule of Civil Procedure 65 is an "extraordinary remedy" the movant must prove is necessary. Ass'n of Equip. Mfrs. v. Burgum, No. 1:17-cv-151, 2017 WL 8791104, at *6 (D.N.D. Dec. 14, 2017). When evaluating a motion for a preliminary injunction under Rule 65, the Court must analyze four factors called the "Dataphase" factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between [the alleged

existing] harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." Cent. Specialties, Inc. v. Mountrail Cnty., No. 1:21-cv-050, 2021 WL 2672043, slip op. at *4 (D.N.D. April 12, 2021) (alterations added) (quoting Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). The Eighth Circuit has noted the third factor—success on the merits—is the most important. See Roudachevski v. All-Am. Care Ctrs., Inc., 648 F.3d 701, 706 (8th Cir. 2011). North Dakota does not need to "prove a greater than fifty per cent likelihood that it will prevail on the merits," rather, it simply must show it has a "fair chance of prevailing." Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp., LLC, 953 F.3d 1041, 1044-45 (8th Cir. 2020) (alteration omitted) (first quoting Dataphase Sys., Inc., 640 F.2d at 113, and then quoting Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)).

### 1.  Fair Chance of Prevailing on the Merits: The Mineral Leasing Act

[¶ 68]  The Court begins with the most important Dataphase factor: whether North Dakota has a fair chance of prevailing on its claim the Federal Defendants violated the MLA. The Parties' contentions regarding the MLA fall into three general categories. First, they hold differing views on when a parcel becomes "available" for leasing. See 30 U.S.C. § 226(b)(1)(A) (requiring quarterly lease sales only when "eligible lands are *available*" (emphasis added)). Second, they disagree regarding whether the Federal Defendants violated their mandatory duties under the MLA. Third, they offer starkly different stories about whether the Federal Defendants had or have a policy to cancel quarterly lease sales in North Dakota.

### a.  When Federal Lands Become "Available" for Quarterly Lease Sales

[¶ 69]  A significant portion of the Parties' dispute is what constitutes "available" lands under the MLA. The definition of "available" lands is no small matter because when lands are "eligible" and

"available," then BLM's duty to hold quarterly lease sales is triggered. See 30 U.S.C. § 226(b)(1)(A). See also Doc. No. 69-2, p. 9 (stating a sale "must still be held each quarter" where lands meet the two criteria). "Available," however, is not statutorily defined.[36] North Dakota's opening memorandum in support of its Motion argues lands become "available" once they are nominated via an EOI to be included in a Notice of Competitive Lease Sale. According to North Dakota, only after lands are nominated (and thus, "available") does BLM or the relevant SMA ensure the lands comply with NEPA and other statutory requirements. Doc. No. 69, p. 15 (citing 43 C.F.R. § 3120.1-1(e)). On the other hand, the Federal Defendants rely on BLM's Manual MS-3120 and the 1989 DOI Memo for the definition of "available." There, "available" lands are those parcels "open to leasing in the applicable [RMP], and when all statutory requirements and reviews have been met, including compliance with [NEPA]." BLM Manual MS-3120, subd. .11. Accord Doc. No. 69-2, p. 9 (quoting the preamble to DOI's final rulemaking). In its Reply and during the hearing on its Motion (see Doc. No. 86, pp. 50:19-51:16), North Dakota appeared to retreat from its original stance and inch closer to the Federal Defendants' construction of "available."

[¶ 70]  The Court agrees with the Federal Defendants insofar as "available" means those lands "open to leasing in the applicable [RMP], and when all statutory requirements and reviews have been met, including compliance with [NEPA]." BLM Manual MS-3120, subd. .11. See Chevron, U.S.A. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's

---

[36] "Eligible" is not statutorily defined either, but BLM has long recognized lands are "eligible" when they are "identified in 43 CFR 3100.0-3 as being subject to leasing, i.e., lands not excluded from leasing by a statutory or regulatory prohibition." BLM Manual MS-3120, subd. .1. See W. Energy All., 877 F.3d at 1162 (same). While the Federal Defendants argue North Dakota has misconstrued the definition of "eligible," the real fight in this litigation is over the definition of "available," as the Federal Defendants recognize. The Court leaves BLM's definition of "eligible" undisturbed and will focus on the definition of "available."

answer is based on a permissible construction of the statute."). The text of 43 C.F.R. § 3120.1-1, which North Dakota relies upon to support its alternative definition, does not elucidate what "available" means. Although the regulation's title seems to conclude the lands described by that provision are "available for competitive leasing," the regulation's text instructs "lands *available* for leasing shall be offered for competitive bidding under this subpart, including but are not limited to: . . . (e) Lands included in any expression of interest . . . ." 43 C.F.R. § 3120.1-1(e) (emphasis added). The regulation does not make the lands categorically "available"—it specifies the types of land that, once "available," must be offered for competitive bidding. Id.

[¶ 71]  Looking at the grand scheme of federal oil and gas leasing, the definition of "available" from BLM's Manual is reasonable.[37] The first part of the definition—the land must be identified for development in the relevant RMP—harkens to the statutory and regulatory requirements that all activity on federal land must comply with the appropriate RMP. See Norton, 542 U.S. at 69. As for the second half of this definition—the land has also met statutory requirements, including NEPA compliance—appears related to regulations requiring the relevant SMA to (1) verify the specific parcel has been properly analyzed for NEPA purposes and (2) issue a recommendation to lease (or not lease) the parcel, which then BLM has to review and "accept" when "reasonable." 43 C.F.R. § 3101.7-2(c). See, e.g., 36 C.F.R. § 228.102(e) (discussing part of the procedure for when the USFS is the SMA). See also Ctr. for Biological Diversity, 444 F. Supp. 3d at 840-42 (detailing the interaction between BLM and USFS in the federal oil and gas leasing process). Given the statutory and regulatory basis for the Federal Defendants' definition, the Court accepts that

---

[37] As further analyzed herein, the Court does not find the MLA permits the Secretary to deem all lands "available" or "unavailable" discretionarily, as the Federal Defendants and Intervenors suggest. See, e.g., Doc. No. 93, p. 5 (picking a select partial quote from 30 U.S.C. § 226(c) and stating: "Congress confirmed that land is 'made available by the Secretary of the Interior' for competitive leasing.").

rendering of "available." Accordingly, "available" lands are those that (a) are open to oil and gas development in their respective RMPs and (b) meet "all statutory requirements and reviews," which include compliance with NEPA. BLM Manual MS-3120, subd. .11. Accord W. Energy All., 877 F.3d at 1162 ("'Available' lands are those open to leasing in the applicable [RMP], . . . when all statutory requirements and reviews have been met." (alteration in original and internal quotation marks omitted) (quoting BLM Manual MS-3120, subd. .11)).

[¶ 72] With this definition of "available" in hand, the Federal Defendants and Intervenors' concerns raised in their Oppositions and during the hearing on the Motion dissipate. They argue, for instance, North Dakota's original rendering of "availability" would require BLM to automatically lease lands nominated via EOIs even though the Secretary of Agriculture might object to leasing or the NEPA analyses might be incomplete. See, e.g., 30 U.S.C. § 226(h) ("The Secretary of the Interior may not issue any lease on National Forest System Lands reserved from the public domain over the objection of the Secretary of Agriculture."). The Federal Defendants also contend North Dakota's proposed definition of "available" would require BLM to lease land whose title became disputed although the land was once deemed "available" and "eligible." See Doc. No. 86, pp. 64:9-65:8. See also Doc. No. 74-2, p. 2 (mentioning some land included in EOIs are "accreted lands" whose federal mineral ownership may be disputed). Although the Federal Defendants and Intervenors overlook part of North Dakota's argument (for instance, "available" lands would still have to comply with NEPA prior to being leased), their alarm is unnecessary given the Court agrees the definition of "available" from the BLM Manual is proper.

**b. North Dakota Has a Significant Chance of Proving the Federal Defendants Violated Their Mandatory Duties under the MLA in the Challenged Quarters**

[¶ 73]  With the definition of "available" lands settled at this stage, the Court now addresses whether North Dakota has a "fair chance of prevailing" on its claim the Federal Defendants violated their mandatory duties under the MLA. Jet Midwest Int'l Co., Ltd., 953 F.3d at 1045 (quoting Planned Parenthood Minn., N.D., S.D., 530 F.3d at 732). After reviewing the record and analyzing relevant law, the Court concludes North Dakota is likely to prevail on its claim the Federal Defendants failed to plan for and timely complete the necessary analyses for determining whether eligible lands were "available" on a quarterly basis, as is required by 30 U.S.C. § 226(b)(1)(A). See Doc. No. 69, p. 21 ("NEPA does not transform the statutory requirement to conduct quarterly lease sales into a discretionary obligation to be conducted on the Federal Defendants' own indefinite and undisclosed schedule.").

**i.  Cancellation of the Q1 2021 Lease Sale in North Dakota Was Very Likely a Violation of the MLA**

[¶ 74]  The record reflects BLM held no Q1 2021 lease sale in North Dakota due to (1) the then-Acting Deputy Solicitor's opinion that all in-progress or completed environmental analyses in Colorado and the Montana-Dakotas regions likely did not satisfy NEPA based on "rapidly-evolving state of the law," "novel challenges posed by greenhouse gas analysis," and a "truncated period" of review (Doc. No. 22-6, p. 11); (2) a nationwide backlog of NEPA analyses (see Doc. No. 22-1, p. 3); and (3) BLM focusing its energy on developing the final 2020 BLM Specialist Report, which, in turn was influenced by the EO. These events collectively demonstrate the "postponement," or better said, "cancellation," of the Q1 2021 lease sale in North Dakota was very likely the result of the Federal Defendants failing to plan and timely complete mandatory analyses

of individual parcels in North Dakota.[38] <u>See</u> Doc. No. 69-2, p. 10 ("[T]he obligation to hold quarterly sales carries with it the responsibility to plan the activities necessary to have eligible lands available for sale.").

[¶ 75]  At the time the Federal Defendants cancelled the Q1 2021 quarterly lease sale in North Dakota, BLM knew of and apparently accepted the SMA's recommendations to lease certain parcels in North Dakota. Doc. No. 22-6, pp. 10-11. <u>See</u> 43 C.F.R. § 3101.7-2(c) (stating BLM is required to both review the SMA's recommendation to lease a parcel and "accept all reasonable recommendations of the [SMA]"). In fact, BLM circulated a draft Environmental Assessment for those parcels so they could proceed in the Q1 2021 leasing process. Doc. No. 22-6, pp. 10-11. While these North Dakota parcels were heading toward a lease sale, the Federal Defendants were aware some courts had found other states' parcels needed more robust NEPA analyses. <u>See</u> Doc. No. 22-1, p. 2 (citing cases). Numerous of those decisions, notably, were decided years before Q1 2021. <u>Id.</u> Correspondingly, BLM already completed a draft plan to solve its GHG litigation problems (i.e., a seeming solution to any NEPA deficiencies) as far back as May 2020 (nine months before the Q1 2021 lease sale was "postponed"). <u>See</u> Doc. No. 44-2, p. 2. But, instead of implementing the potential solution to any alleged NEPA problems in North Dakota, the Federal Defendants cancelled the Q1 2021 lease sale two days before they were statutorily required to issue a Notice of Competitive Lease Sale. <u>See</u> 30 U.S.C. § 226(f). <u>See also</u> Doc. No. 69-2, p. 10 (recognizing DOI must plan activities to complete its statutory duties on a quarterly basis).

[¶ 76]  There is no evidence in the record that North Dakota's cancelled Q1 2021 lease sale was due to a surprise NEPA issue or other unexpected legal problem. As already mentioned, NEPA-

---

[38] North Dakota does not argue the Secretary abused her discretion during the course of 2021 and 2022, accordingly, the Court will not wade into those waters.

related litigation had been ongoing for years in other states,[39] as had the NEPA analyses' backlog nationwide. See Doc. No. 22-1, p. 3. Instead, the record reflects the Federal Defendants halted the lease sale for internal reasons. While suggesting the parcels in North Dakota *likely* (but not definitively) did not meet the "availability" requirements, the then-Acting Deputy Solicitor noted the lease sale should be called off partly due to a "truncated period of [BLM's] review." Doc. No. 22-6, p. 11. Why the review period was "truncated" and what was being "review[ed]" is not explicitly stated (id.), but there are strong implications the "truncated" timeline was self-inflicted and very little (if any) "review" of individual parcels in North Dakota occurred.

[¶ 77]   The first indication the "truncated" review timeline was self-imposed is Secretarial Order Number 3395 ("S.O. 3395"). Prior to the EO's promulgation, on January 20, 2021 (the day of President Biden's inauguration), then-Acting Secretary of the Interior issued S.O. 3395, which temporarily suspended certain delegations of authority to DOI's "Bureaus and Offices" and also required specified actions to be approved by the Secretary, Deputy Secretary, Solicitor, or various Assistant Secretaries themselves. Most relevantly, DOI's Bureaus and Offices could not publish notices of proposed or final agency action in the *Federal Register* or take other actions regarding NEPA analyses. In other words, a significant number of steps required under statute and regulation for oil and gas lease sales across the country had to be approved by the top echelon. See, e.g., 43 C.F.R. § 3101.7-2(c) (requiring BLM to review and accept the relevant SMA's reasonable recommendation to lease or not lease land). While this litigation poses no challenge to S.O. 3395, the reality is S.O. 3395 necessarily put a strain on DOI's resources and time.

---

[39] Although the Federal Defendants' Opposition focuses on the November 2020 litigation in which a court found NEPA analyses in another state were problematic (see WildEarth Guardians v. Bernhardt, No. 16-1724, 2020 WL 6701317 (D.D.C. Nov. 13, 2020)), they fail to explain how the issues highlighted by that court are remarkably novel or different than those in other cases that had been ongoing for years prior (see Doc. No. 22-1, p. 2).

[¶ 78]  A second event highlighted by the Federal Defendants as a constraint on their time to review Q1 2021 parcels in North Dakota was BLM's nationwide backlog of NEPA analyses. See Doc. No. 22-1, pp. 2-3. The Federal Defendants themselves note a sizeable portion of that backlog was caused by BLM's voluntarily choosing to redo NEPA analyses for parcels from 2015 and other years. See id. A backlog, however, is not a permissible excuse to miss a statutory deadline. See Forest Guardians, 174 F.3d at 1181 (finding the Secretary of the Interior "failed to comply with a mandatory, non-discretionary duty unambiguously imposed by the ESA" even though the Secretary encountered a "backlog" of work due to Congress' 13-month spending moratorium).

[¶ 79]  The third and final "time" constraint affecting North Dakota's Q1 2021 lease sale was BLM's focused effort on the 2020 BLM Specialist Report. See Doc. No. 44-2, p. 3. While dedicating their time to compiling nationwide GHG emissions during 2020 and estimates for 2021, the Federal Defendants ignored their statutory duty to ensure lands (or even a singular parcel) in North Dakota were timely assessed for the Q1 2021 quarterly lease sale. See 30 U.S.C. § 226(b)(1)(A). The 2020 BLM Specialist Report may have provided valuable information for sustainable energy development, but its importance cannot override the statutory command for (1) lands to be timely evaluated for potential leasing and (2) quarterly lease sales to occur when parcels meet the statutory requirements under 30 U.S.C. § 226(b)(1)(A). See Doc. No. 69-2, p. 10 ("[DOI] must caution, however, that the obligation to hold quarterly sales carries with it the responsibility to plan the activities necessary to have eligible lands available for sale.").

[¶ 80]  In sum, the record reflects the Federal Defendants knew of NEPA concerns in other states for years; had a backlog of NEPA analyses; were still preparing for an upcoming sale with "administratively available" parcels in North Dakota as of early January 2021 (pre-EO); projected other states' NEPA issues onto North Dakota last minute to render the lands "unavailable" despite

having months to adjust the NEPA analyses;[40] and then determined no parcels were "available" in the eleventh hour in the 2021 DOI Memo without there being any evidence that determination was based on a review of individual parcels in North Dakota. This Court recognizes the Federal Defendants experienced a change in administration during this time, but a new administration is still statutorily required to timely and diligently complete its mandatory statutory duties issued by Congress in accordance with 30 U.S.C. § 226. In other words, the quarterly lease sale in Q1 2021 was not a "time bomb" handed to them by the previous administration, Org. for Competitive Mkts., 912 F.3d at 458, especially given that North Dakota's lands had been timely moving toward a lease sale with no successful litigation challenges of which this Court is aware.

[¶ 81]  The Federal Defendants' attempt to justify their lease sale cancellation due to NEPA-related litigation and North Dakota's spotty history of quarterly lease sales is misplaced. First, the litigation concerning deficient NEPA analyses involved parcels in *other states* from years past and/or did not mention the implications of the Acting Deputy Solicitor's "truncated" review comment. See Doc. No. 22-1, pp. 1-2 (citing cases); see also W. Energy All. v. Biden, No. 21-CV-13, 2022 WL 18587039, slip op. at *9-10 (D. Wyo. Sept. 2, 2022) (finding no fault with the Q1 2021 lease sale "postponement" but failing to mention the "truncated" review portion of the 2021 DOI Memo). Even if those out-of-state litigations had implications for North Dakota, that still does not explain why the record fails to show the Federal Defendants conducted renewed individual analyses of the North Dakota parcels' suitability for leasing before cancelling the sale (or making time to reevaluate even one parcel). Second, whether pre-2021 quarterly lease sale cancellations in North Dakota were legally justified or unjustified is not an issue before this Court. See, e.g.,

---

[40] The Court expresses no opinion on whether the parcels in North Dakota had or have potential shortfalls in their respective NEPA or other required analyses.

Doc. No. 93, pp. 2-3 (describing the history of lease sales in North Dakota and noting RMP revisions in 2017 were partly to blame for a lack of some quarterly lease sales). Furthermore, a history of unlawful action (assuming it was so) is no excuse for future unlawful action.

[¶ 82]  The Federal Defendants and Intervenors' defense of there being no Q1 2021 lease sale in North Dakota (among other quarters) is effectively a push for the statutory words of "quarterly" lease sales or "available" land to be terms or conditions defined by the Secretary's discretion. That position, however, is untenable given the MLA's language and purpose. For instance, all Federal lands could meet objective NEPA and other statutory requirements yet never be noticed for lease due to the discretionary decision that a policymaker has a different plan, the agency is overworked already, a report is in-process and needs more time, or some ongoing litigation may affect leasing. But, when there are no "available" lands, no lease sales may occur. See 30 U.S.C. § 226. Such a possibility is clearly contrary to Congress' purpose in enacting the MLA. Indeed, the MLA was intended to "promote" and incentivize oil and gas production as well as provide revenue for the Federal Government—not for politicians to halt leasing based on discretionary decisions made outside of the halls of Congress. See Arkla Expl. Co., 734 F.2d at 358; Doc. No. 69-2, p. 9 ("Section 17(b)(1)(A) requires a quarterly lease sale wherever eligible lands are available for leasing. The Committee reports indicate that Congress did not intend to give the Secretary any discretion in this regard.").

[¶ 83]  Put another way, the Secretary's discretion to choose which available lands to lease in 30 U.S.C. § 226(a) cannot override the congressional mandate to timely evaluate whether lands meet the leasing requirements in § 226(b)(1)(A) and *to lease* at least some available and eligible lands on a quarterly basis. See Marathon Oil Co. v. Lujan, 937 F.2d 498, 500 (10th Cir. 1991) ("Administrative agencies do not possess the discretion to avoid discharging the duties that

- 44 -

Congress intended them to perform."). The MLA does not permit the Federal Defendants to "skip" a quarterly lease sale due to an agency's self-inflicted "truncated" review period, a nationwide NEPA analysis backlog, focused effort on a nationwide survey of emissions, or *speculation* that a parcel (let alone all parcels) fails to meet NEPA's requirements based on other states' litigations. See 30 U.S.C. § 226. Accordingly, the Court finds North Dakota is likely to prevail on the merits that the Federal Defendants' cancellation of the Q1 2021 lease sale in North Dakota was based on a failure to prepare for and timely fulfill their mandatory statutory duties under 30 U.S.C. § 226(b)(1)(A).

### ii.   Cancellation of the Q2 2021 Lease Sale in North Dakota Was Very Likely a Violation of the MLA

[¶ 84]  Despite lands being nominated via EOIs and being posted online with recommended stipulations for leasing,[41] no lease sale in North Dakota occurred in Q2 2021. The internal BLM/DOI email from early March stopped "further consideration of Quarter Two sales" due to DOI strategizing "how the Department will implement" the EO. Doc. No. 22-6, p. 17. On BLM's website, the noted reason for the cancellation was "the Bureau of Land Management . . . exercis[ed] its discretion to not hold lease sales" due to the EO and the DOI's "ongoing review of the federal oil and gas program."[42] The Federal Defendants argue no land in North Dakota was "available" in Q2 2021 because they determined "additional NEPA work was needed to avoid litigation risk," and such a determination is unreviewable under the APA because it is discretionary. Doc. No. 74,

---

[41] See Letter from Donato Judice, Deputy State Director, Energy, Mineral & Realty, Bureau of Land Management, Interior Regions 5 & 9, Montana-Dakotas State Office, supra note 12 (describing parcels had preliminarily received stipulations for leasing in January 2021, but only discussing their inclusion in a potential sale that might occur five months later).

[42] See Press Release, Statement on Second Quarter Oil and Gas Lease Sales, supra note 9.

p. 35. They further contend the lack of a lease sale in Q2 2021 is also justified by another court finding the previous quarter—Q1 2021—was excused from having a lease sale. See W. Energy All., 2022 WL 18587039, slip op. at *9-10. This Court is not so convinced.

[¶ 85]  Although a federal agency's decision to appeal an adverse court decision or to take a particular strategic litigation course may be "generally committed to agency discretion by law," Didrickson v. U.S. Dep't of Interior, 982 F.2d 1332, 1339 (9th Cir. 1992), the Federal Defendants' decision to forgo the Q2 2021 lease sale in North Dakota is a final agency action reviewable by this Court, particularly given the clear mandate in 30 U.S.C. § 226(b)(1)(A) to hold quarterly lease sales when land is "eligible" and "available," see Heckler v. Chaney, 470 U.S. 821, 830 (1985) ("The legislative history of the [APA] indicates that [the exception for action 'committed to agency discretion'] is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971))).

[¶ 86]  Neither the Secretary nor BLM have "discretion" to postpone a quarterly lease sale. 30 U.S.C. § 226. See Doc. No. 69-2, p. 9 ("Congress did not intend to give the Secretary any discretion in this regard."). In 1987, Congress explicitly rejected the idea that the "Secretary [could] suspend or postpone lease sales if [she] determine[d] that such suspension or postponement best serve[d] the interests of the United States." H.R. 933. In lieu of that possibility, Congress mandated the Secretary to hold "[l]ease sales . . . for each State where eligible lands are available at least quarterly." 30 U.S.C. § 226(b)(1)(A). See also Federal Onshore Oil and Gas Leasing Reform Act of 1987, § 5102; 43 C.F.R. § 3120.1-2(a) ("Each proper BLM State office shall hold sales at least quarterly if lands are available for competitive leasing."). And, as already explained, the Secretary's discretion to lease cannot override her and the other Federal Defendants' congressional

- 46 -

mandate to timely make eligibility and availability determinations so that quarterly lease sales may occur or not occur. Indeed, DOI highlighted that time-constrained responsibility when it issued the 1989 DOI Memo, stating it had an "obligation" to hold quarterly lease sales, which necessitated it "*plan[ning]* the activities necessary to have eligible lands available for sale." Doc. No. 69-2, p. 10 (emphasis added). In short, timely assessments of lands must be done, and they must be mindful of Congress' intent to actually hold lease sales. <u>See, e.g.</u>, Mineral Leasing Act of 1920, 66 Cong. 2d Sess., Ch. 85, 41 Stat. 437 (enacting the MLA "[t]o promote the mining of coal, phosphate, oil, oil shale, gas, and sodium on the public domain"); <u>Arkla Expl. Co.</u>, 734 F.2d at 358 (same).

[¶ 87]  There will almost always be events that make the planning process and actual holding of lease sales inconvenient, but Congress issued a mandate in 30 U.S.C. § 226(b)(1)(A). The Federal Defendants' actions will always displease one group or another (i.e., litigation is a sure bet in the Federal Government[43]). Governmental orders will be promulgated with one political bent or another. A new report will always be underway, and processes will be reviewed and revamped. If the Secretary could discretionarily label lands as "unavailable" or otherwise cancel a lease sale based on these "sure-to-happen" events, no lease sale might ever happen in any state. That is, however, contrary to Congress' design for the MLA and precisely what seems to have happened here—a lease sale cancellation due to political policy reasons rather than a diligent assessment of each individual parcel nominated in North Dakota to see if it could be an "eligible land[] [made] available for sale." Doc. No. 69-2, p. 10. <u>Arkla Expl. Co.</u>, 734 F.2d at 358 (explaining the MLA was intended to promote leasing and provide revenue for the Federal Government). Indeed, the March 1, 2021, internal BLM/DOI email confirms as much—it halted all parcels' analyses because

---

[43] The Court does not suggest a court order could not affect preparation for lease sales or the sales themselves.

the DOI was determining how to implement the EO—not because any particular parcel in North Dakota was "unavailable." Doc. No. 22-6, p. 17 (noting DOI was "*postponing further decision* on how the Department will implement the [EO]," but it "has not yet rendered any such decisions[]," so "*[i]n the meantime*, please post the following update on the relevant website(s): 'The oil and gas lease sale scheduled for April, 2021 has been postponed'" (emphases added)).

[¶ 88]   The Court is unaware of litigation concluding any of the nominated parcels in North Dakota for the Q2 2021 sale (or for the Q1 2021 sale, for that matter) were problematic under NEPA, not to mention the relevant SMAs had already initially approved them for sale with stipulations. The Court, therefore, finds the Federal Defendants very likely violated their mandatory statutory duty to plan and timely complete the parcels' statutory analyses pursuant to their congressional mandate. See 30 U.S.C. § 226(b)(1)(A). See also Doc. No. 22-6, p. 17 (stating DOI "postpone[ed] further consideration" of Q2 2021 lease sales due to the EO).

### iii. Cancellation of the Q3 2021 Lease Sale in North Dakota Was Very Likely a Violation of the MLA

[¶ 89]   The Federal Defendants offer the same excuses to defend the lack of a Q3 2021 lease sale in North Dakota: the nationwide NEPA overhaul prompted by the EO was still ongoing. See Doc. No. 44-2 (noting the comprehensive NEPA review due to the EO was not completed until October 2021 (Q4 2021)). The record, however, supports North Dakota's argument that the Federal Defendants very likely shirked their statutory duties in this quarter.

[¶ 90]   Although the 2021 Louisiana Injunction required the Secretary, DOI, BLM, and others to stop "the Pause of new oil and gas leases" as of June 15, 2021 (i.e., Q2 2021), the deadline for noticing a Q3 2021 lease sale in North Dakota came and went. See 30 U.S.C. § 226(f) (requiring a notice at least 45 days before offering lands for lease). The week following the missed deadline, on August 23, 2021, North Dakota filed its Motion for Writ of Mandamus. Doc. No. 5. The

following day, DOI issued a press release recognizing the effect of the 2021 Louisiana Injunction and promised to "post for scoping parcels included in the Quarter 1 and Quarter 2 2021 leasing deferrals by the end of August" for a later sale.[44] The next day, BLM updated the "Project Status" of the Q3 2021 lease sale to be "Paused"—no explanation, documentation, or public comment was offered.[45]

[¶ 91]  No evidence in the record reflects the Federal Defendants attempted to begin, or even complete, the "eligibility" and "availability" analyses for parcels (let alone a single parcel) in time for the Q3 2021 lease sale in North Dakota. 30 U.S.C. § 226(b)(1)(A) ("Lease sales shall be held for each State where eligible lands are available at least quarterly[.]"). See Doc. No. 69-2, p. 10 (detailing DOI has an "obligation" to hold quarterly lease sales and must necessarily plan to complete the necessary steps to make that happen). Instead, it appears they rubber stamped "unavailable" on all parcels to avoid reviewing and making them potentially open to leasing. The Federal Defendants' *post hoc* rationalization that the Q3 2021 lease sale was cancelled due to the nationwide "ongoing NEPA overhaul" further evidences this finding. Moreover, it is particularly egregious the Federal Defendants issued a "Pause[]"[46] on the Q3 2021 North Dakota lease sale when they were subject to a court-ordered nationwide injunction issued just months prior that prevented them from doing just that—hitting "pause" on leasing. Louisiana, 543 F. Supp. 3d at 419 (enjoining and restraining the "Agency Defendants . . . from implementing said Pause"). It

---

[44] Press Release, Interior Department Files Court Brief Outlining Next Steps in Leasing Program, supra note 13.

[45] BLM National NEPA Register:2021 September Oil & Gas Competitive Lease Sale, supra note 15.

[46] Id.

bears repeating the discretion of a politically appointed official cannot override a congressional mandate or flaunt a duly issued court order. For these reasons, the Court finds the Federal Defendants, again, very likely violated their mandatory statutory duties to plan and timely complete their review of parcels in North Dakota for a potential Q3 2021 lease sale.

### iv.   Cancellation of the Q4 2021 Lease Sale in North Dakota Was Very Likely a Violation of the MLA

[¶ 92]  The Federal Defendants appear to offer no excuse for their failure to hold the Q4 2021 lease sale in North Dakota. See Doc. No. 74, p. 19. Instead, the record demonstrates they acted as if Q4 2021 never existed.

[¶ 93]  The Federal Defendants mention in passing the GHG report was completed in early October 2021, but skip over any explanation for why parcels in North Dakota could not have been simultaneously reviewed for Q4 2021 while the report was being "finalized." See Doc. No. 44-2 (noting the report's first draft was completed in May 2020 in response to adverse court decisions). There is no evidence in the record of the Federal Defendants intending to evaluate any lands for leasing in Q4 2021 despite being ordered by the 2021 Louisiana Injunction to stop the "Pause" on oil leasing. See Louisiana, 543 F. Supp. 3d at 419. For instance, the BLM Montana-Dakotas website has no mention of Q4 2021—there is no reference regarding any preparation for a lease sale in that quarter or reasons for the sale's cancellation.[47] Ultimately, even if no lands were "available" for leasing in Q4 2021, the Federal Defendants still had the legal obligation to timely start and complete the lands' assessments for potential leasing in North Dakota. See 30 U.S.C. § 226(b)(1)(A); see also Doc. No. 69-2, p. 10.  However, instead of fulfilling that obligation, they

---

[47] Montana-Dakotas Oil & Gas Lease Sales, supra note 7 (failing to mention the Q4 2021 lease sale under the "2021 Lease Sales" or other tab).

likely internally rubber stamped the lands as "unavailable" in Q4 2021 and skipped onto the next quarter. For these reasons, the Court finds the Federal Defendants very likely violated their mandatory statutory duties to plan and timely complete North Dakota parcels' statutory review for leasing in Q4 2021.

### v. Cancellation of the Q1 2022 Lease Sale in North Dakota Was Very Likely a Violation of the MLA

[¶ 94]  Despite multiple assurances from the Federal Defendants that lease sales would occur in Q1 2022 (see Doc. No. 22-1, p. 6; see also Doc. No. 38, p. 9),[48] the Q1 2022 sale in North Dakota never happened. The Federal Defendants explain the GHG Louisiana Injunction was issued days before the Q1 2022 statutory lease sale notice deadline, and this injunction prohibited DOI from relying upon NEPA analyses that considered "any and all Social Cost of Greenhouse Gas estimates." See Doc. No. 74, p. 19; 39, pp. 3-4 (quoting Louisiana, 585 F. Supp. 3d at 852, 870). Given the North Dakota parcels' analyses relied on those "Social Cost" estimates, the Federal Defendants argue the preliminary GHG Louisiana Injunction "halted" the Q1 2022 lease sale. Id. at p. 20. That is, the Federal Defendants had to redo the NEPA analyses and they were not completed in time for the Q1 2022 lease sale. Id. The Court is unpersuaded a statutory violation did not occur.

[¶ 95]  First, North Dakota was not a party to the Louisiana litigation and the GHG Louisiana Injunction does not state it has a nationwide scope, unlike the 2021 Louisiana Injunction. Compare Louisiana, 585 F. Supp. 3d at 852, 870, with Louisiana, 543 F. Supp. 3d at 418 ("This Court does not favor nationwide injunctions unless absolutely necessary. However, it is necessary here

---

[48] See also Letter from Donato J. Judice, Deputy State Director, Energy, Mineral & Realty, Bureau of Land Management, Interior Regions 5 & 9, Montana-Dakotas State Office, supra note 22; ENVIRONMENTAL ASSESSMENT: FIRST QUARTER 2022 OIL & GAS LEASE PARCEL SALE, DOI-BLM-MT-0000-2021-0006-EA, supra note 26.

because of the need for uniformity."). Thus, the Federal Defendants' apparent decision to adhere to this new limited-in-scope injunction that could be used to "halt" a lease sale in North Dakota while seemingly ignoring the 2021 Louisiana Injunction while it was effective (which explicitly ordered leasing to move forward nationwide) speaks volumes. Second, the Federal Defendants' cancellation of the Q1 2022 lease sale in North Dakota was precisely what the GHG Louisiana Injunction was trying to prevent. During the hearing on North Dakota's present Motion, the Federal Defendants admitted parcels that passed the NEPA analyses incorporating the "Social Cost" estimates underwent "more stringent" analyses than what the Louisiana court required. See Doc. No. 86, pp. 96:6-97:12. So, even though lands in North Dakota were headed toward a Q1 2022 lease sale under the more exacting environmental analysis, the lease sale was cancelled. That is precisely part of the harm the Louisiana court was trying to prevent. That court said:

> To be sure, the Administration's use of the [Social Cost of GHG] Estimates in NEPA reviews to analyze the climate impact of oil and gas lease sales under the MLA directly causes harm to the Plaintiff States' statutorily vested rights to proceeds from MLA oil and gas leases. **In other words, the [Social Cost of GHG] Estimates artificially increase the cost estimates of lease sales, which in effect, reduces the number of parcels being leased, resulting in the States receiving less in bonus bids, ground rents, and production royalties**.

Louisiana, 585 F. Supp. 3d at 858 (emphasis added). Put simply, the Louisiana court enjoined various Federal Government actors from improperly wielding a heightened environmental standard (the "Social Cost of GHG Estimates") to eliminate parcels' availability for leasing under the MLA. Id. Yet, the Federal Defendants here effectively did what that court said not to do—just from a different angle of attack. In North Dakota, the Federal Defendants previously determined certain lands were administratively available for leasing after having satisfied the Social Cost of

GHG rubric.[49] Following the new GHG Louisiana Injunction, however, the Federal Defendants explain no sale occurred *because* North Dakota's lands had passed that heightened environmental standard. See Louisiana, 585 F. Supp. 3d at 852 (enjoining the Federal actors from "[a]dopting, employing, treating as binding, or relying upon . . . any and all Social Cost of [GHG] estimates"). Not only does the Court believe the GHG Louisiana Injunction was inapplicable to North Dakota, but also that injunction was intended to prevent lease sale cancellations due to social costs of GHG analyses—not cancel sales that were already set to occur.

[¶ 96]  The Court recognizes the Federal Defendants' hesitation about proceeding with the sale given the Louisiana court ordered certain Federal actors to "disregard" the Social Cost GHG estimates, see id. at 849, 870, but there were multiple avenues to assuage that hesitation and still timely comply with their statutory duties with respect to the Q1 2022 lease sale in North Dakota. To any extent North Dakota was effected by the GHG Louisiana Injunction, the Federal Defendants could have (1) during briefing and argument in that case, requested the court to permit existing lease sales to go forward where lands were available despite the litigation's outcome; (2) completed alternative NEPA analyses "disregarding" the Social Cost estimates either during or after the litigation; and/or (3) at the very least, requested the court to permit the lease sales to go forward after the injunction's issuance. The record, however, reflects no action on behalf of the Federal Defendants. Instead, yet again in the face of adverse litigation in other states, the Federal Defendants took no action to complete analyses of North Dakota's individual parcels.

---

[49] Letter from Donato J. Judice, Deputy State Director, Energy, Mineral & Realty, Bureau of Land Management, Interior Regions 5 & 9, Montana-Dakotas State Office supra note 22; see also ENVIRONMENTAL ASSESSMENT: FIRST QUARTER 2022 OIL & GAS LEASE PARCEL SALE, DOI-BLM-MT-0000-2021-0006-EA, supra note 26.

Accordingly, the Court finds the Federal Defendants very likely violated their mandatory statutory duties to plan and timely complete their review of parcels in North Dakota for leasing in Q1 2022.

### vi.   Cancellation of the Q3 2022 Lease Sale in North Dakota Was Very Likely a Violation of the MLA

[¶ 97]  The Federal Defendants argue no Q3 2022 lease sale took place in North Dakota due to them needing time to analyze the newly enacted IRA's effects on federal leasing and the "delays occasioned by the injunction from the Western District of Louisiana." Doc. No. 74-1, p. 7 ("BLM *did not exercise its discretion* to hold onshore lease sales *in time* for sales in the third and fourth quarters of 2022." (emphases added) (citing Louisiana, 585 F. Supp. 3d at 852, 870). See also Doc. No. 74, p. 14. Neither the passage of the IRA nor the injunction may excuse the lack of a Q3 2022 lease sale in North Dakota.

[¶ 98]  The IRA was signed into law the same day as the Federal Defendants' statutory deadline for noticing whether a Q3 2022 lease sale was going to happen in North Dakota. See 30 U.S.C. § 226(f) (requiring 45 days' notice before offering lands for lease). The failure to hold a Q3 2022 lease sale due to the IRA is rather ironic. That statute was intended, in part, to *promote* oil and gas leasing by conditioning certain federal renewable energy projects on the Secretary holding lease sales and offering "not less than the lesser of—(i) 2,000,000 acres; and (ii) 50 percent of the acreage for which [EOIs] have been submitted for lease sales during" a one-year period. Inflation Reduction Act of 2022, Pub. L. 117-169, 136 Stat. 1818, 2061. See also 43 U.S.C. § 3006(b)(1)(B). Even assuming the Federal Defendants required "time" to evaluate the IRA's impacts, the record appears to betray their position that they intended to hold a lease sale but-for the new legislation.

[¶ 99]  The BLM Montana-Dakotas website is silent regarding Q3 2022.[50] Nothing indicates they were evaluating North Dakota parcels' availability and eligibility for a Q3 2022 lease sale or even going to "postpone" the quarter's sale—"Q3 2022" appears nowhere.[51] To this Court, the Federal Defendants represented no "determinations of availability" went forward in North Dakota since the IRA's enactment. Doc. No. 86, p. 98:22-24. The implication from this evidence is the Federal Defendants never intended to hold a Q3 2022 lease sale and the IRA provided a convenient excuse.

[¶ 100] The Federal Defendants claim the GHG Louisiana Injunction justified the Q3 2022 sale process "delay." The fact that the Federal Defendants held a lease sale in Q2 2022 (i.e., the quarter after the GHG Louisiana Injunction was issued) eviscerates their reasoning. That injunction, which was issued in Q1 2022, did not hold up the Q2 2022 sale. See Louisiana, 585 F. Supp. 3d at 852, 870. That same injunction, therefore, should not have impeded the Q3 2022 sale. The Federal Defendants, however, fail to provide any justification in this regard. Moreover, the absence of any Q3 2022 lease sale activity on the BLM Montana-Dakotas' website (either in furtherance of a sale or to "postpone" it), again, provides more evidence that the Federal Defendants never intended to hold a Q3 2022 lease sale.

[¶ 101] Based on the foregoing, the Court finds the Federal Defendants very likely failed to adhere to their mandatory statutory duties to plan and timely complete mandatory analyses of individual parcels in North Dakota for a Q3 2022 lease sale.

---

[50] See Montana-Dakotas Oil & Gas Lease Sales, supra note 7 (noting BLM held a sale in June 2022, but making no mention of Q3 or Q4 of 2022).

[51] See id. (mentioning nothing regarding Q3 or Q4 of 2022).

### vii.  Cancellation of the Q4 2022 Lease Sale in North Dakota Was Very Likely a Violation of the MLA

[¶ 102] The Federal Defendants offer the same reasons for not holding a Q4 2022 lease sale in North Dakota as they did for the lack of a Q3 2022 lease sale. See Doc. Nos. 74, p. 14, 74-1, p. 7 (explaining the lack of a Q4 2022 lease sale because BLM did not "exercise its discretion" to hold a lease sale "in time"). The same reasoning and same conclusion apply for Q4 2022 as it did for Q3 2022—the Federal Defendants very likely violated their mandatory statutory duties to plan and timely complete mandatory analyses of individual parcels in North Dakota for a Q4 2022 lease sale. See 30 U.S.C. § 226(b)(1)(A) ("Lease sales shall be held for each State where eligible lands are available at least quarterly[.]"). See also Doc. No. 69-2, p. 10 ("[T]he obligation to hold quarterly sales carries with it the responsibility to plan the activities necessary to have eligible lands available for sale."). The Federal Defendants effectively conceded as much when they told this Court no "determinations of availability" were made in North Dakota during Q4 2022 (Doc. No. 86, p. 98:22-24). The President also proceeded to say the quiet part out loud when he announced to the public there would be "no more drilling" in November 2022.[52]

### c.  The Pattern of & Reasoning behind Cancelling Quarterly Sales in North Dakota Demonstrates the Federal Defendants Have a Policy to "Stop" Oil & Gas Leasing

[¶ 103] North Dakota contends the Federal Defendants' "indefinite[ ] fail[ure] to take the steps necessary to complete the NEPA reviews" and "continued cancellation of each discrete quarterly lease sale challenged" evidences they had a "blanket policy" of cancelling quarterly lease sales in North Dakota during 2021 and 2022. Doc. No. 81, p. 9. The Federal Defendants contest the existence of such an "unwritten" policy to cancel lease sales, stating "no basis" exists for such a

---

[52] Blackmon, supra note 33.

finding, particularly given they held a Q2 2022 lease sale and are planning the upcoming Q2 2023 lease sale. Doc. No. 86, p. 105:6-9. See also Doc. No. 74-1, p. 9 ("No written or unwritten moratorium exists that prohibits BLM from holding lease sales."). Furthermore, as a catchall, the Federal Defendants and Intervenors contend the Supreme Court's 1931 case of United States ex rel. McLennan v. Wilbur, 283 U.S. 414 (1931), excuses the cancellations because the "Supreme Court unanimously affirmed the Secretary's authority under the MLA to issue a 'general order' rejecting oil and gas applications." Doc. No. 74, p. 26. See also Doc. No. 73, p. 24. The Court agrees with North Dakota.

[¶ 104] The Court cannot ignore what the Federal Defendants and the President have explicitly said at least three times: (1) the EO ordered a "pause [on] new oil and natural gas leases on public lands," Exec. Order No. 14008, 86 Fed. Reg. at 7624-25; (2) the internal DOI/BLM memo "postpone[ed] further consideration of Quarter Two sales (including authorization of the sales) pending decisions on how the Department will implement the [EO]" (Doc. No. 22-6, p. 17); and (3) the President gave remarks to the public there would be "[n]o more drilling" and he had not "formed any new drilling" as of November 7, 2022.[53] The Federal Defendants' behind-the-scenes actions in 2021 and 2022 have also been consistent with this pattern of stopping the statutory analyses and leasing process in North Dakota.

[¶ 105] As explained by a Senior Mineral Leasing Specialist within BLM and as stated in the 2021 DOI Memo, no sale in Q1 2021 took place due to (1) a nationwide backlog of NEPA analyses; (2) development of a nationwide GHG report; and (3) other states' litigation problems being imposed onto North Dakota's parcels. See Doc. Nos. 22-1, p. 3 (explaining "adverse NEPA

---

[53] Id.

decisions" and a "growing accumulation" of NEPA analyses caused BLM to postpone Q1 2021 lease sales), 22-6, pp.10-11 (noting analyses of parcels in the Montana-Dakotas area likely did not satisfy NEPA due to other litigation decisions, the changes in GHG analyses, and a "truncated period" of review). The Q2 2021 lease sale was canceled because DOI was contemplating how to implement the EO—not because individual parcels in North Dakota had been individually analyzed and failed to meet NEPA. See Doc. No. 22-6, p. 17. No Q3 2021 lease sale occurred despite the 2021 Louisiana Injunction's then-effective order to stop the leasing "Pause." Louisiana, 543 F. Supp. 3d at 419. Moreover, there is no evidence the Federal Defendants attempted to begin the "availability" analyses for North Dakota's parcels in Q3 2021—the BLM Montana-Dakotas website never mentions Q3 2021 and elsewhere the sale is just noted as "Paused" without further explanation.[54] See Doc. No. 69-2, p. 10 (explaining DOI has an "obligation" to hold quarterly lease sales and must necessarily plan to complete the necessary steps to make that happen). Q4 2021 came and went without mention or explanation on the BLM Montana-Dakotas website.[55] There was hope for a Q1 2022 lease sale in North Dakota,[56] but it was ultimately cancelled without explanation on BLM's website.[57] The cancelled Q1 2022 was apparently due to the GHG

---

[54] See Montana-Dakotas Oil & Gas Lease Sales, supra note 7 (failing to mention the Q3 2021 lease sale under the "2021 Lease Sales" tab); see also BLM National NEPA Register:2021 September Oil & Gas Competitive Lease Sale, supra note 15.

[55] See Montana-Dakotas Oil & Gas Lease Sales, supra note 7 (failing to mention the Q4 2021 lease sale under the "2021 Lease Sales" or other tab).

[56] Letter from Donato J. Judice, Deputy State Director, Energy, Mineral & Realty, Bureau of Land Management, Interior Regions 5 & 9, Montana-Dakotas State Office supra note 22. See also ENVIRONMENTAL ASSESSMENT: FIRST QUARTER 2022 OIL & GAS LEASE PARCEL SALE, DOI-BLM-MT-0000-2021-0006-EA, supra note 26.

[57] See Montana-Dakotas Oil & Gas Lease Sales, supra note 7 (noting BLM "experienced technical issues during the current comment period" on the anticipated Q1 2022 lease sale in North Dakota, but failing to offer an explanation as to its non-occurrence under the "2022 Lease Sales" tab).

Louisiana Injunction, which was not nationwide in scope and was actually intended to increase parcels' availability for leasing—not eliminate them from potential leasing, as was done here. See Louisiana, 585 F. Supp. 3d at 858. The Q3 2022 lease sale notice deadline was conveniently the same day the IRA was signed into law, but even absent the new legislation, there is no evidence the Federal Defendants were preparing for a Q3 2022 lease sale. See Doc. No. 69-2, p. 10 ("[T]he obligation to hold quarterly sales carries with it the responsibility to plan the activities necessary to have eligible lands available for sale."). Similarly, regarding the Q4 2022 would-be lease sale in North Dakota, the Federal Defendants represented no lands were analyzed for leasing in North Dakota. See Doc. No. 86, p. 98:22-24. See also Louisiana, 2022 WL 3570933, at *15 ("The discretion to stop the lease process for eligible lands is not within the discretion of the agency by law under the . . . MLA."). Based on this cumulative evidence, the Court finds the Federal Defendants instituted an unlawful policy to disregard their statutory duty to appropriately plan for and complete their determination of whether nominated land was "available" and "eligible" on a timely, quarterly basis (the "Stop") in 2021 and 2022 in North Dakota. See Louisiana, 2022 WL 3570933, at *7 (W.D. La. Aug. 18, 2022) (finding the government agencies unlawfully instituted a "stop" of the federal leasing process).

[¶ 106] The Q2 2022 lease sale in North Dakota does not undermine the Court's finding there was an unlawful Stop. The Q2 2022 lease sale appears to have acted as a "safety valve" when multiple litigation actions and decisions effectively ordered leasing to continue. Just before the Q2 2022 sale in North Dakota, multiple events amounted legal pressure to hold the lease sales: (1) the 2021 Louisiana Injunction had mandated the "Pause" on leasing to end, but no leasing in North Dakota was going forward; (2) North Dakota's Complaint and Writ of Mandamus were filed; and (3) the GHG Louisiana Injunction was issued, which ordered the Federal Government to stop using a

heightened NEPA review process that was eliminating parcels' availability for leasing. Had the Q2 2022 lease sale in North Dakota not gone forward, the Federal Defendants may have been held in contempt or faced other legal challenges. Accordingly, this Court finds the Q2 2022 lease sale in North Dakota was neither a cancellation of nor an event undermining the Federal Defendants' Stop of new oil and gas leasing in the State.

[¶ 107] Neither do the anticipated Q2, Q3, and Q4 2023 lease sales undermine this Court's finding of the Stop. Although quarters in 2023 are not the subject of this litigation, they are pertinent because the Federal Defendants and Intervenors contend the upcoming Q2, Q3, Q4 2023 lease sales are evidence of leasing going forward in North Dakota. See Doc. Nos. 74, pp. 10, 21, 73, p. 8, 94-1, p. 6. Notably absent from this list is Q1 2023. There is no lease sale planned in North Dakota for that quarter—Q1 2023 is not even mentioned on the BLM Montana-Dakotas website.[58] The Federal Defendants have represented the BLM Montana-Dakotas Office "needed more time" to evaluate the IRA in that region despite other BLM offices around the country moving forward with leasing in Q1 2023. Doc. No. 86, p. 101:12-18. As for the lease sales planned in Q2, Q3, and Q4 of 2023, this Court was previously given futile assurances that lease sales in North Dakota would proceed in the past. See, e.g., Doc. Nos. 22-1, p. 6, 38, p. 9. Those dashed assurances give the Court little confidence in the Federal Defendants' ability to make good on future promises.

[¶ 108] Finally, the Supreme Court's 1931 case of Wilbur cannot justify the Federal Defendants' Stop. See 283 U.S. 414. Wilbur analyzed the Secretary's authority to issue a general order rejecting and/or refusing "applications for permits to prospect for oil and gas under section 13" of the MLA. Id. at 418-19. The Court affirmed the Secretary's order (which was implemented to "effectuate the conservation policy of the President") because it found "one may interpret section 13 as the

---

[58] Id.

Secretary says he did," which was a conclusion "aided by consideration of his general powers over the public lands" and "the right of the President to withdraw public lands" pursuant to the Withdrawal Act of 1910. Id. Section 13 of the MLA was the basis for Wilbur's decision (codified at 30 U.S.C. § 221), and it is no longer in effect. In fact, it expired by its own terms as of December 31, 1938. See Act of August 21, 1935, 74th Cong. Ch. 599, 674-75 (amending Section 13 of the MLA). See also Mineral Leasing Act of 1920, 66th Cong. 85, 41 Stat. 437, 441-42. Additionally, Wilbur does not account for the 1987 amendment to the MLA that added 30 U.S.C. § 226(b)(1)(A): "Lease sales shall be held for each State where eligible lands are available at least quarterly[.]" See Federal Onshore Oil and Gas Leasing Reform Act of 1987, § 5102. See also Udall v. Tallman, 380 U.S. 1, 21-22 (1965) (putting Wilbur "in context"). Accordingly, Wilbur cannot and does not authorize the Stop.

[¶ 109] Again, having reviewed the current record before the Court and relevant law, the Federal Defendants instituted the Stop without a lawful basis. See Louisiana, 2022 WL 3570933, at *7 (W.D. La. Aug. 18, 2022) (finding the government agencies instituted an unlawful "stop" of the federal leasing process).

### d. North Dakota's Challenge under the MLA Is Not Time-Barred by a Statute of Limitations

[¶ 110] Alternatively, the Federal Defendants contend North Dakota is unlikely to succeed on its MLA claims because the six-year statute of limitations in 28 U.S.C. § 2401(a) has run. They argue the State's requested relief "is a collateral attack on 43 C.F.R. § 3120.1-3," which was issued in 1988 and authorizes the Assistant Secretary for Land and Minerals Management to "suspend a lease sale for good and just cause after reviewing the reason(s) for an appeal." Doc. No. 74, p. 38. North Dakota retorts 43 C.F.R. § 3120.1-3 is "not at issue because there have not been any noticed

lease sales, and thus no appeals for the Federal Defendants to review." Doc. No. 81, p. 14. The Court agrees with North Dakota.

[¶ 111] It is overwhelmingly clear North Dakota is not collaterally attacking 43 C.F.R. § 3120.1-3, but rather directly challenging whether the Federal Defendants' actions (or lack thereof) violated their mandatory statutory duties. Accordingly, North Dakota's cause of action did not expire in 1994 (i.e., six years following the promulgation of § 3120.1-3). See 28 U.S.C. § 2401(a). There is simply no challenge brought here to 43 C.F.R. § 3120.1-3 because no Notice of Competitive Lease Sale has been issued for any of the challenged quarters, so no pending appeals exist regarding a parcel's inclusion in a sale that would trigger § 3120.1-3. Doc. No. 86, p. 16:11-20 (affirming BLM did not publish a notice of lease sale but for Q2 2022). See W. Energy All., 877 F.3d at 1162 (explaining once the Notice is published, a protest period may begin). Notably, if 28 U.S.C. § 2401 were the only applicable statute of limitations, North Dakota would have until 2027 (six years after the cancellation of the Q1 2021 lease sale) to file this suit. The Federal Defendants' argument regarding the statute of limitations running based on North Dakota's alleged "collateral attack" on 43 C.F.R. § 3120.1-3 is a classic red herring and lacks merit.

[¶ 112] The Federal Defendants also argue North Dakota's action under the MLA (except the challenge to Q4 2022) is time-barred by 30 U.S.C. § 226-2, which requires an "action contesting a decision of the Secretary involving any oil and gas lease" to be "commenced or taken within ninety days after the final decision of the secretary relating to such matter." Doc. No. 74, pp. 38-39. They contend if the Secretary's "decisions to postpone or not hold lease sales constitute final agency action," then the State's challenge had to be brought within 90 days of each decision. Id. at p. 39. North Dakota again says the cited statute is not applicable, this time because § 226-2 applies to situations where parties contest the issuance of an oil and gas lease—not here, where

the State is challenging the Federal Defendants' non-compliance with their statutory obligations. Doc. No. 81, p. 15. The Court again agrees with North Dakota.

[¶ 113] The Court is unaware of 30 U.S.C. § 226-2 being meaningfully analyzed as it relates to the Secretary's decision to "postpone" (i.e., cancel) lease sales. See Am. Petro. Inst. v. U.S. Dep't of Interior, No. 2:21-CV-02506, 2022 WL 16704444, slip op. at *6 (W.D. La. Oct. 5, 2022) (finding the claim challenging the cancellation of sales could not be dismissed due to the statute of limitations given the mixed question of law and fact). Instead, case law tends to discuss § 226-2 in the context of the Secretary refusing to issue a lease or cancelling the lease issuance after the lease sale occurred. See, e.g., Impact Energy Res., LLC v. Salazar, 693 F.3d 1239, 1241 (10th Cir. 2012) (finding challenges to the Secretary's refusal to issue leases after the auction were not brought within 90-days); Arkla Expl. Co., 734 F.2d at 354 (concluding challenges to the Secretary's invalidation of leases was not time-barred).

[¶ 114] Looking to the statute's plain language, it is obvious 30 U.S.C. § 226-2 is limited to situations where an actual lease is involved—i.e., a document tailored to a specific parcel—not merely the planning stages of which parcels could hypothetically be leased after a lease sale. First, comparing terminology in 30 U.S.C. § 226 and 30 U.S.C. § 226-2, Congress drafted the latter statute of limitations to only apply where there is a "lease" involved, not the process by which parcels are evaluated for potential leasing. Second, having § 226-2 apply to lease sales would also ignore the distinct nature and statutory procedures for lease sales versus a lease issuance. As already discussed, lease sales involve an immense procedural rigmarole for evaluating whether land is "available" and "eligible" for the lease sale (which may or may not occur). That same lease sale process is not applicable to the drafting of the ultimate lease. In sum, Congress drafted § 226-

2 to apply to decisions involving leases—not lease sales. Accordingly, 30 U.S.C. § 226-2 does not bar North Dakota's MLA claims.

### 2.  Fair Chance of Prevailing on the Merits: Federal Land Policy & Management Act

[¶ 115] North Dakota contends it will likely prevail in demonstrating the Federal Defendants have violated the Federal Land Policy & Management Act in Q3 and Q4 2021 as well as Q1, Q3, and Q4 2022. Doc. No. 69, p. 24. Specifically, North Dakota argues the Federal Defendants effectively withdrew (a "*de facto*" withdrawal) lands that were identified for oil and gas development in their RMPs from such development by failing to complete their analyses and include them in a lease sale during 2021 and 2022, and such withdrawal was in violation of 43 U.S.C. § 1714 because the Federal Defendants failed to provide proper public or congressional notice for that withdrawal. The Federal Defendants claim their actions do not meet the statutory definition of a "withdrawal" in 43 U.S.C. § 1702(j) and North Dakota's RMPs fail to make the parcels therein "available" for leasing.[59] The Court agrees with North Dakota.

[¶ 116] The FLPMA requires the Secretary to "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by [her] under section 1712 of this title when they are available," with some exceptions. 43 U.S.C. § 1732(a). Stated differently, the Secretary must manage lands according to their respective RMPs. See Norton, 542 U.S. at 69. The Secretary is allowed to "withdraw" land from an RMP's stated use, "but only in accordance with the provisions and limitations of" section 1714. 43 U.S.C. § 1714(a). A "withdrawal" is pertinently defined as "withholding an area of Federal land from settlement,

---

[59] The Federal Defendants also repeat several of their MLA-related arguments about "availability" while defending their actions under the FLPMA. See Doc. No. 74, pp. 39-42. The Court need not repeat its analysis of such issues but will address the pertinent FLPMA arguments.

**sale**, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws." Id. § 1702(j) (emphasis added). If the Secretary decides she wants to withdraw certain lands, her proposal for the withdrawal must first be published in the *Federal Register*. Id. § 1714(b)(1).[60] Upon the proposal's publication, the land may be "segregated from the operation of the public land laws to the extent specified in the notice." Id. The "segregate effect of the application" (i.e., the land's segregation) stops once the Secretary formally withdraws the lands, two years pass from the public withdrawal notice's date, among other events. Id. The Secretary is authorized to withdraw an aggregate of 5,000 acres or more for a maximum of twenty-years, but she must notify Congress of the withdrawal "no later than its effective date" and receive Congress' approval for the action. Id. § 1714(c)(1).

[¶ 117] North Dakota is likely to succeed in showing the Federal Defendants engaged in a *de facto* withdrawal of public lands within its borders in Q3 and Q4 2021, and Q1, Q3, and Q4 2022, in violation of the FLPMA. Although another court concluded the Q1 2021 lease sale -cancellation was not a "withdrawal," see W. Energy All., 2022 WL 18587039, at *12, (finding the Q1 2021 sale cancellation was not a "withdrawal" because (1) it was the only quarter in the record and (2) the record showed the postponement was merely due to NEPA concerns), the Court is unpersuaded by its reasoning because North Dakota does not challenge that quarter under the FLPMA. Instead, the record here establishes numerous land nominations in North Dakota during the challenged quarters were "pending" for a significant period of time "without action by the Secretary of the Interior." Mountain States Legal Found., 499 F. Supp. at 386, 392 (concluding an "unauthorized *de facto* withdrawal" of public lands occurred). See, e.g., Doc. No. 86, pp. 98:22-

---

[60] The publication requirements are not applicable to "emergency withdrawals" under 43 U.S.C. § 1714(e). See 43 U.S.C. § 1714(b)(2). North Dakota does not contend there was an emergency withdrawal and neither do the Federal Defendants.

24, 101:12-18 (acknowledging no parcels were evaluated between August 16, 2022, and Q4 2022, and no lease sales will occur until at least Q2 2023).

[¶ 118] North Dakota's RMPs identified hundreds of thousands of acres in North Dakota as open for potential leasing in 2021 and 2022, but apparently individual land's evaluations were not completed and definitively no leasing occurred aside from the lone Q2 2022 lease sale.[61] See, e.g., Doc. Nos. 69-3, pp. 37-40, 196-212 (North Dakota Resource Management Plan), 69-4, p. 22 (United States Department of Agriculture Northern Great Plains Management Plans Revision), 69-5 (U.S. Army Corp's Garrison Dam-Lake Sakakawea Management Plan). The Federal Defendants are correct an RMP itself does not complete the lands' "availability" analysis for leasing under 30 U.S.C. § 226, but when the RMP identifies lands as open for oil and gas leasing, BLM cannot "take[] actions inconsistent with [those] provisions." Norton, 542 U.S. at 69.

[¶ 119] Under the control of the Federal Defendants, lands identified for development in North Dakota sat with incomplete analyses for almost a year-and-a-half before the Q2 2022 lease sale happened. These lands continued to sit for another two quarters in 2022 (Q3 and Q4 2022).[62] The Court need not set a bright line for when a withdrawal occurs[63]—whether that be a single missed

---

[61] BLM is currently collecting public review and comments for proposed changes to an RMP in North Dakota. See Press Release, BLM North Dakota RMP/EIS Public Comment Period Starts, BUREAU OF LAND MGMT. (Jan. 20, 2023), https://www.blm.gov/press-release/blm-north-dakota-rmpeis-public-comment-period-starts.

[62] The Court notes no lease sale has been noticed until June 27, 2023 (Q2 2023), and the Court is not convinced the Federal Defendants will follow through with this lease sale given their history relating to lease sales noted throughout this Order. BLM National NEPA Register: BLM Montana-Dakotas June 2023 Oil and Gas Lease Parcel Sale, BUREAU OF LAND MGMT. (last updated Mar. 10, 2023, 9:14 AM), https://eplanning.blm.gov/eplanning-ui/project/2022645/510.

[63] The Intervenors argue the Federal Defendants' failure to schedule fewer than four quarterly lease sales in a year should not meet the definition of a "withdrawal." Doc. No. 73, p. 34. They further contend forcing BLM to follow formal withdrawal procedures would lead to "absurd results"

quarter or several—but what is evident is the Secretary held-up thousands of acres' analyses due

to a discretionary "policy" not to plan and timely complete parcels' analyses for leasing for a year-

and-a-half, and then again for at least another two quarters. These lands were effectively

"withdrawn" from their identified public use. 43 U.S.C. § 1702(j). As another court said:

> We doubt that it can be said that the legislative history of the Mineral Leasing Act
> of 1920 indicates that Congress intended for the Secretary of the Interior to have
> the ability to effectively withdraw large areas of land from mineral exploration and
> development based solely on the desire for wilderness preservation and without
> consideration of the mineral potential in the area. The stated purpose of the Mineral
> Leasing Act was to allow the Secretary of the Interior to regulate oil and gas, to
> prevent monopoly and waste, and to protect the interest of the public in retaining
> some of the oil reserves for the use of the government.
>
>          *       *       *
>
> The Mineral Leasing Act was intended to promote wise development of natural
> resources and to obtain for the public reasonable financial returns on assets
> belonging to the public. California Co. v. Udall, 296 F.2d 384 (D.C. Cir. 1961).
> The Secretary of the Interior must administer the Mineral Leasing Act so as to
> provide some incentive for, and to promote the development of oil and gas deposits
> in all publicly-owned lands of the United States through private enterprise. Harvey
> v. Udall, 384 F.2d 883 (10th Cir. 1967). **To withhold vast tracts of land from oil
> and gas leasing for the purpose of wilderness preservation is, to withdraw and
> withhold the lands from the purposes and operation of the Mineral Leasing
> Act. If Congress had intended that result when it passed the sweeping Federal
> Land Policy and Management Act in 1976, which was the product of the Land
> Law Review Commission's extensive studies of the entire area of public land
> law, we feel Congress would have said so, and it didn't.**

Mountain States Legal Found., 499 F. Supp. at 392-93 (emphasis added). The Court concludes the

Federal Defendants very likely *de facto* withdrew federal land within North Dakota's borders from

---

because BLM could hold a lease sale the following quarter after issuing the public notice of
withdrawal, thus making the withdrawal notice moot. Id. As already discussed, these arguments
are based on (1) the incorrect assumption the Federal Defendants have "discretion" to decide when
to complete the *quarterly* "availability" analyses of individual parcels in each state; and (2) an
improper reading of case law that extrapolates the conclusion that a whole state's parcels may be
excused from completed leasing analyses for at least a year from a case where one *area* was
excused from leasing. See Bob Marshall All. v. Hodel, 852 F.2d 1223, 1229-30 (9th Cir. 1988)
(finding the refusal to lease a particular area was within the Secretary's discretion).

potential leasing in Q3 and Q4 2021, as well as during Q1, Q3, and Q4 2022, for the purpose of limiting oil and gas leasing in furtherance of their environmental policies and NEPA reconfiguration prompted by the EO. 43 U.S.C. § 1702(j).

[¶ 120] Withdrawals of land trigger public notice requirements. See id. § 1714. The Federal Defendants do not deny de facto withdrawals require public notice and comment and new withdrawals necessitate public hearings (neither of which were done). See id. § 1714(b)(1), (h). They argue, however, they were permitted to "segregate[]" the land for a maximum of two years without having to report to Congress. Doc. No. 74, p. 40 (quoting 43 U.S.C. § 1714(b)). Their contention ignores the very real likelihood they de facto withdrew more than 5,000 acres within North Dakota during 2021 and 2022, which activates the congressional reporting requirements in § 1714(c). See Doc. No. 69, p. 23 (noting one RMP in North Dakota "identifies hundreds of thousands of acres" for potential oil and gas leasing). Accordingly, the Court finds North Dakota is likely to succeed in proving the Federal Defendants conducted de facto withdrawals without following the proper public and congressional notice requirements under the FLPMA.

### 3. North Dakota Has Established Irreparable Harm[64]

[¶ 121] North Dakota next contends it has suffered and is likely suffering irreparable harm as a result of the Federal Defendants' violations of the MLA and FLPMA. The State categorizes its harm into three genres: (1) harm to its sovereign right to develop and regulate state and private

---

[64] Although North Dakota has not raised the potential issue of Native American trust lands in North Dakota being affected by the Federal Defendants' Stop, the Court has expressed concerns the Stop may also be preventing Native Americans from developing their trust lands given the EO issued a nationwide "pause" and no lease sales have been held within the borders of North Dakota but for Q2 2022. See Doc. No. 91, p. 17 (explaining lands held in trust for Native American Tribes are administered by the Bureau of Indian Affairs and governed by the Indian Mineral Leasing Act, 25 U.S.C. § 396 et seq.). The Court, however, issues no opinion on this potential issue given it does not have jurisdiction to address it in this litigation.

minerals because the Federal Defendants' Stop and failure to lease lands blocked North Dakota from accessing state-owned and private mineral interests; (2) economic harm in the form of forgone revenue that would have been otherwise generated from federal quarterly lease sales and from development of state and private mineral interest; and (3) harm to its right to participate in the public notice and comment process required for land withdrawals under the FLPMA.

[¶ 122] The Federal Defendants argue North Dakota has failed meet its burden for four reasons (which the Intervenors reiterate): (1) the State abandoned its "adequate remedy at law" by not completing the litigation in its first action regarding the lease sales; (2) there were/are other avenues for North Dakota to access its state and private mineral interests, such as communitization and compensatory royalty agreements; (3) the State's theory of economic harm relies on the incorrect premises that BLM prevented development of state and private minerals and the State would be certain to receive revenues even though BLM has discretion regarding which parcels to lease; and (4) the injunction would not prevent any irreparable harm because BLM is already preparing for a Q2 2023 lease sale. North Dakota refutes these arguments.

[¶ 123] Upon surveying the record and relevant law, the Court concludes North Dakota has demonstrated it has suffered and is suffering from a threat of irreparable harm as a result of the Federal Defendants' failure to comply with their mandatory statutory duties under the MLA and FLPMA. See Central Specialties, Inc., 2021 WL 2672043, slip op. at *4 (reciting the Dataphase factors).

[¶ 124] "Irreparable harm occurs when a party has no adequate remedy at law." Sleep Number Corp. v. Young, 33 F.4th 1012, 1018 (8th Cir. 2022) (quoting Gen. Motors Corp. v. Harry Brown's LLC, 563 F.3d 312, 319 (8th Cir. 2009)). This is typically because the party's "injuries cannot be fully compensated through an award of damages." Gen. Motors Corp., 563 F.3d at 319. "[A] party

must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Roudachevski, 648 F.3d at 706 (quoting Iowa Utils. Bd. v. FCC, 109 F.3d 418, 425 (8th Cir. 1996)). Courts may "presume irreparable harm if the movant has a likelihood of success on the merits. Kodiak Oil & Gas (USA) Inc. v. Burr, 303 F. Supp. 3d 964, 984 (D.N.D. 2018) (citing Calvin Klein Cosms. Corp. v. Lenox Lab'ys, Inc., 815 F.3d 500, 505 (8th Cir. 1987)). That said, a preliminary injunction is not a tool "simply to eliminate a possibility of a remote future injury." Cent. Specialties, Inc., 2021 WL 2672043, slip op. *6.

[¶ 125] North Dakota did not abandon its potential adequate remedy at law or fail to demonstrate the imminent need of the injunction by not litigating its original action to a resolution on the merits. The State did not have monetary damages as a potential legal remedy pursuant to its claims under the APA. See Lane v. Pena, 518 U.S. 187, 196 (1996) (discussing the APA as an example where Congress waived the Federal Government's sovereign immunity but not to the extent to allow monetary damages). The Court, therefore, interprets the Federal Defendants and Intervenors' arguments regarding the State's delay in litigating the original complaint as going to the "imminence" piece of irreparable harm. See Roudachevski, 648 F.3d at 706.

[¶ 126] North Dakota's original complaint was filed in July 2021 and sought review of the cancelled lease sales in Q1 and Q2 2021 as well as other judicial action to prevent the Federal Defendants from cancelling future lease sales. See Doc. No. 1. While the original action was pending, circumstances changed. North Dakota became protected by the then-in-effect 2021 Louisiana Injunction and the State relied on the Federal Defendants "assurances" that lease sales in North Dakota would be underway in Q1 2022. See Doc. No. 81, p. 21. Although no lease sale in Q1 2022 occurred, the Q2 2022 lease sale seemed to provide hope the Federal Defendants would resume their statutory duties and hold regular lease sales.

[¶ 127] To the chagrin of North Dakota, lease sales did not continue after Q2 2022. Two more quarters passed with no lease sales and the State lost the protection of the 2021 Louisiana Injunction, so North Dakota began a new action in January 2023 to encompass all relevant quarters in 2021 and 2022, and to ensure more quarters would not similarly be subject to the Stop. Given this turn of events and North Dakota taking action after the cancelled lease sales, the Court concludes North Dakota's choice to not litigate its first action on the merits but instead file a new action close-in-time to cancelled lease sales does not undermine its theory of irreparable harm. See Adventist Health Sys./SunBelt, Inc. v. U.S. Dep't of Health & Hum. Servs., 17 F.4th 793, 805 ("A party requesting a preliminary injunction must generally show reasonable diligence." (alteration omitted) (quoting Benisek v. Lamone, 138 S. Ct. 1942, 1944 (2018)).

[¶ 128] Continuing with the "imminence" portion of irreparable harm, the Federal Defendants' assurances a Q2, Q3, and Q4 2023 lease sale in North Dakota are underway similarly do not make North Dakota's threat of harm less imminent or its request for a preliminary injunction only a tool to protect against a "remote future injury." Cent. Specialties, Inc., 2021 WL 2672043, slip op. *6. Based on the Federal Defendants' various spurious assurances to this Court and North Dakota that leasing would go forward and their history of cancelling parcel evaluations and lease sales in North Dakota, there is a very concrete possibility the Q2, Q3, and/or Q4 2023 lease sales in North Dakota will be similarly cancelled if an injunction were denied.

[¶ 129] Although communitization agreements and compensatory royalty agreements may allow the State to access some of its own interests, the evidence still demonstrates North Dakota suffers a threat of irreparable harm to its sovereignty by not being to access its publicly and privately owned mineral interests due to the Federal Defendants' Stop. This finding requires some background on North Dakota's land use configurations.

[¶ 130] North Dakota's lands are generally managed by subdividing the land into "spacing units," which are typically one mile by two miles in size (1280 acres). Doc. No. 69, p. 10. Those spacing units, however, do not always contain mineral and land interests belonging to a singular party. Over a hundred thousand acres in North Dakota (North Dakota represents it to be approximately 30%) are subject to a "split estate" system. See Doc. Nos. 69, p. 10, 69-4, p. 22 (explaining split estates within Little Missouri National Grassland). In this arrangement, the land's surface is owned by North Dakota or a private party while the land's subsurface minerals are owned by the Federal Government (or vice versa). See Doc. No. 69-4, p. 22; see also Mandan v. U.S. Dep't of the Interior, No. 1:19-cv-0037, 2021 WL 8322489, slip op. at *22 (D.N.D. Feb. 22, 2021) (describing more of North Dakota's split estate system). Some of North Dakota's spacing units also contain privately-owned and/or state-owned mineral interests sitting side-by-side with federal mineral interests. See, e.g., Doc. No. 84-3 (showing a map reflecting state and federal minerals coinciding in the same land blocs).

[¶ 131] Given the existence of split estate systems and complexity of drilling for oil and gas, the Federal Government, states, and private parties may enter into arrangements for mineral interest owners to generally access their interests. Most oil well drilling requires drilling "thousands of feet below the surface in targeted geological formations and often proceed for a mile, two, or sometimes even 3 miles underground."[65] In other words, drilling into one party's interests may require going through or near another party's interests or land. This has prompted North Dakota, private parties, and/or the Federal Government to enter into "communitization agreements" ("CAs") and/or compensatory royalty agreements, which are intended to help facilitate each

---

[65] Leasing and Development of Split Estate, BUREAU OF LAND MGMT., https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/split-estate (last visited Mar. 25, 2023).

party's access to its own interests. See, e.g., Doc. No. 69-1 ("[T]he parties [to this CA] hereto desire to communitize and pool their respective mineral interests in lands . . . for the purpose of developing and producing communitized substances[.]"). These types of agreements are also a way for North Dakota to fulfill its duty "to prevent waste, to avoid the drilling of unnecessary wells, or to protect correlative rights." N.D. CENT. CODE § 38-08-07(1). See also N.D. CENT. CODE § 38-08-08(1) (requiring owners and royalty owners of lands, when "two or more separately owned tracts are embraced within a spacing unit, or when there are separately owned interests in all or a part of the spacing unit," to "pool their interests for the development and operation of the spacing unit" either voluntarily or sometimes involuntarily); N.D. CENT. CODE. § 38-08-01 (declaring the State's policy to "prevent waste").

[¶ 132] CAs and compensatory royalty agreements, however, are not solutions to North Dakota's harm. Those agreements provide conditional and limited avenues for North Dakota to access non-federal mineral interests—they do not carry promises the State will be able to fully access its own or other private interests. For instance, the Intervenors represent federal land subject to a CA does not have to be leased at any point. See Doc. No. 91, p. 13 (citing Doc. No. 84-4 (example CA agreement in North Dakota)). And where there are unleased federal minerals in a spacing unit subject to a CA, private and/or state interests may be drilled in that spacing unit only if: (1) drilling can proceed without penetrating federal interests; (2) BLM approves of a compensatory royalty agreement whereby the operator will pay royalties into an escrow account for the benefit of the Federal Government to cover the possibility of the drill tapping into federal interests; and (3) the operator pays the royalties before drilling. Doc. No. 69-1, p. 137. See 30 U.S.C. § 226(m) (authorizing the Secretary to enter into CAs and royalty agreements); see also 43 C.F.R § 3100.2-1 (authorizing compensatory royalty agreements). This type of situation results in operators paying

significant royalties into escrow to the Federal Government while leaving certain state- and privately-owned interests untapped (i.e., creating "waste") for fear of penetrating unleased federal mineral interests, which, if tapped, could result in federal prosecution. See Doc. No. 69-1, p. 137 ("If an operator drills into and produces from unleased Federal or Indian minerals this will be considered mineral trespass and the operator may be subject to prosecution."). Alternatively, operators will not drill state or private minerals in such circumstances because paying the royalties is not economical or the risk of tapping unleased federal interests is too great. See Doc. No. 86.

[¶ 133] North Dakota's irreparable harm to its sovereign rights is not necessarily that a *few* state- and privately-owned interests remain "wasted" as a result of *some* federal lands subject to CAs being unleased or that the State and private individuals have to pay *some* compensatory royalties. Those appear to be regular occurrences even where the Federal Defendants may be performing their statutory duties and leasing federal lands. See, e.g., Doc. No. 84-4 (2015 CA agreement recognizing some royalties will have to paid). Rather, the State's harm is federal lands across-the-board are being unleased due to the Stop, which has (1) undermined North Dakota's and the Federal Defendant's purpose for entering into the CAs, i.e., to promote the development and production of oil and gas (see, e.g., Doc. No. 84-4, p. 1 (declaring the Federal Government's "desire" to enter into the CA "for the purpose of developing and producing communitized substances")); (2) resulted in North Dakota likely having to pay significantly more in royalties (in an aggregate amount, not necessarily a higher royalty rate) in order to access its own and privately-owned mineral interests (assuming the Federal Defendants are even approving of compensatory royalty agreements and CAs); and (3) likely more of North Dakota's interests and private interests are being wasted, thus undermining the State's duty to "prevent waste." N.D. CENT. CODE. § 38-08-01 (declaring the State's policy to "prevent waste"). These new across-the-board harms are not

"the State's own making," as the Intervenors contend (Doc. No. 91, p. 12), but immense expense, waste, and frustrated contracts directly flowing from the Federal Defendant's Stop in North Dakota. The fact a few federal lands in North Dakota were leased in Q2 2022 does not undermine this finding (see Doc. No. 91, pp. 15-17), for North Dakota very likely has and is still suffering from the same harms even with the Federal Defendants' "safety valve" Q2 2022 lease sale.

[¶ 134] Turning to North Dakota's economic harm, the Parties debate whether North Dakota actually suffered any economic harm and whether the State's calculations of its estimated monetary damages are accurate and admissible. See, e.g., Doc. No. 91, p. 10 n.12 (arguing Mr. Helms' claims are conclusory, unsupported, and inadmissible under Federal Rule of Evidence 702). The Federal Defendants raised several objections during the hearing on North Dakota's Motion and also filed an objection regarding the testimony and declaration of the Director of the North Dakota Industrial Commission Department of Mineral Resources, Lynn Helms. See Doc. Nos. 86, 96. Furthermore, the Intervenors characterize any of North Dakota's potential economic harm as "temporary" and incapable of satisfying this prong. See Doc. No. 73, p. 20 (citing Wildhawk Invs., LLC v. Brava I.P., LLC, 27 F.4th 587, 597 (8th Cir. 2022) ("Economic loss, on its own, is not an irreparable injury so long as the losses can be recovered." (quoting DISH Network Serv. L.L.C. v. Laducer, 725 F.3d 877, 882 (8th Cir. 2013)))). The Court finds North Dakota has suffered and is suffering irreparable economic harm as a result of the Federal Defendants' actions. See Iowa Utils. Bd., 109 F.3d at 426 ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm.").

[¶ 135] The exact dollar figure of North Dakota's harm and its method of calculation are irrelevant for purposes of this Motion. It is apparent North Dakota was and is entitled to receive "sales, bonuses, royalties," and other revenues when federal lands are leased, 30 U.S.C. § 191(a), and this

Court has already found North Dakota is very likely to prevail in proving the Federal Defendants failed to comport with their mandatory statutory duties related to leasing. Not only that, but the Court also concluded North Dakota was very likely going to be successful in demonstrating it was prevented from accessing its own state and private mineral interests as a result of the Federal Defendants' actions, which would necessarily cause economic harm.

[¶ 136] Moreover, characterizing North Dakota's economic harm as "temporary" and "recuperable" ignores monetary and legal realities. North Dakota's income from federal and non-federal leasing supports education services, natural resources projects, developmental disability services, infrastructure, and more on a monthly basis within the State. Doc. No. 69, p. 12. The State's loss of income represents lost time and ability to invest in and render services to families, students, the environment, and the State's citizens in general. On top of that, revenue lost is lost forever from a legal standpoint—North Dakota cannot seek backpay from the Federal Defendants pursuant to its suit under the APA. See Lane, 518 U.S. at 196 (noting the APA's waiver of sovereign immunity only extends so far as the plaintiff does not seek monetary damages); Batsche v. Burwell, 210 F. Supp. 3d 1130 (D. Minn. 2016) ("[A] plaintiff who seeks 'money damages' from the United States cannot rely on [5 U.S.C.] § 702 as a waiver of sovereign immunity."). Thus, there is evidence North Dakota suffered irreparable economic harm, and that alone is sufficient for purposes of this Motion. See Kodiak Oil & Gas (USA) Inc., 303 F. Supp. 3d at 984 (noting courts are allowed to assume irreparable harm when the movant is likely to succeed on the merits). To the extent necessary, the Court overrules the Federal Defendants' objections relating to the damages amount and has taken due consideration of those figures presented to the Court. See Doc. No. 96.

### 4.   The Balance of Equities & Public Interest Favor a Preliminary Injunction

[¶ 137]  The third Dataphase factor requires the Court to evaluate whether "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." Nebraska v. Biden, 52 F.4th 1044, 1046 (8th Cir. 2022) (quoting Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 370 (8th Cir. 1991)). In completing this evaluation, the Court must "look[] at the threat to each of the parties' rights that would result from granting or denying the injunction." Weather Modification LLC v. Brackin, No. 3:20-cv-73, 2020 WL 4606843, slip op. at *6 (D.N.D. June 12, 2020).

[¶ 138] The Federal Defendants and Intervenors present a parade of horribles that will allegedly ensue if a preliminary injunction is entered, ranging from parcels being subject to an increased litigation risk to the agencies facing a heavier NEPA workload. On the other end, North Dakota contends there is no harm in ensuring the Federal Defendants complete their statutory duties and, without the injunction, the State's sovereign rights, economic rights, and statutory public participation rights are being harmed. The Court is persuaded by the State.

[¶ 139] The Federal Defendants' fears are based in the Court adopting a new definition of "available," which it has not. Instead, the Court has found North Dakota has demonstrated a very real likelihood the Federal Defendants not only failed to comply with their mandatory statutory duties under the MLA and FLPMA in the challenged quarters, but they also had an unlawful policy to cancel quarterly lease sales in North Dakota (i.e., the Stop). Although requiring the Federal Defendants to timely comply with their mandatory statutory duties so the "availability" and "eligibility" determinations may be properly made in time for quarterly lease sales may increase their workload, that is Congress' problem, not this Court's. See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs., 141 S. Ct. 2485, 2490 (2021) ("[O]ur system does not permit agencies to

act unlawfully even in pursuit of desirable ends."). Consequently, the balance of equities favor protecting North Dakota's interests against the Federal Government's very likely unlawful acts.

[¶ 140] The fourth and final <u>Dataphase</u> factor requires the Court to consider the "public consequences" of using the extraordinary remedy of a preliminary injunction. See <u>Ass'n of Equip. Mfrs.</u>, 2017 WL 8791104, at *11 (quoting <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982)). North Dakota argues there is a strong public interest in ensuring the Federal Defendant follow the law while the Federal Defendants and Intervenors contend the State's requested remedy would compel lease sales without parcels completing the necessary environmental review processes, thus "depriv[ing] future generations of those resources without adequate procedural protections." Doc. No. 74, p. 48.

[¶ 141] The Court's issued remedy, as already discussed herein and further below, is not to force the sale of parcels without them successfully completing the proper analyses. Instead, the remedy is simply for the Federal Defendants to plan for and timely fulfill their mandatory statutory duties to properly complete parcels' "availability" and "eligibility" analyses in North Dakota. There is a robust public interest in ensuring states' rights are protected and the Federal Defendants follow Congress' democratically enacted law. See <u>Carson v. Simon</u>, 978 F.3d 1051, 1061 (8th Cir. 2020) (noting the "public interest is likewise served by" upholding a state's rights against unlawful action). The public interest, thus, favors issuing the preliminary injunction.

[¶ 142] Therefore, the Court finds North Dakota has satisfied all four elements necessary for a preliminary injunction to be issued.

## IV.    Scope of the Injunction

[¶ 143] There is much ado regarding the propriety of North Dakota's requests for relief. North Dakota has requested an order: (1) declaring the cancellations of the quarterly lease sales unlawful;

(2) "[e]njoining and restraining the Federal Defendants under 5 U.S.C. 706(1) and 5 U.S.C. 705 from unlawfully cancelling future quarterly lease sales;" and (3) "[c]ompelling the Federal Defendants under 5 U.S.C. 706(1) to hold the previously cancelled quarterly lease sales for 'available' lands." Doc. No. 68. The Federal Defendants and Intervenors argue it is improper to enter a declaration at this preliminary stage and to compel lease sales because "[r]equiring the defendant the take affirmative action . . . before the issue has been decided on the merits goes beyond the purpose of a *preliminary* injunction." Tumey v. Mycroft AI, Inc., 27 F.4th 657, 664 (8th Cir. 2022) (alterations omitted) (quoting Sanborn Mfg. Co., Inc. v. Campbell Hauself/Scott Fetzer Co., 997 F.2d 484, 490 (8th Cir. 1993)). The Court is persuaded by the Federal Defendants that a declaration and an order to compel are not currently appropriate under the circumstances in this case.[66]

[¶ 144] The Court's duty in fashioning injunctive relief is to ensure it is both "workable" and "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." Nebraska, 52 F.4th at 1048 (first quoting North Carolina v. Covington, 581 U.S. 486, 488 (2017) (per curiam), then quoting Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994)). This is, in part, because "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it

---

[66] The Court is not persuaded, however, by the Federal Defendants' argument that if North Dakota wants to compel agency action unreasonably delayed, then it has to satisfy the six-factor test from Telecommunications Research & Action Center v. FCC, 750 F.2d 70 (D.C. Cir. 1984). See Doc. No. 74, p. 43. This Court is unaware of the Eighth Circuit adopting that test. See Irshad v. Johnson, 754 F.3d 604, 607 (8th Cir. 2014) (noting the "parties embrace[d] the analysis of the D.C. Circuit," but not declaring it was the Eighth Circuit's preferred analysis); see also Org. for Competitive Mkts., 912 F.3d at 462 (mentioning briefly the D.C. Circuit's "less categorical approach" that addresses claims under § 706(1) as petitions for a writ of mandamus, but not adopting that approach).

presents." <u>Trump v. Int'l Refugee Assistance Project</u>, 582 U.S. ____, 137 S. Ct. 2080, 2087 (2017) (per curiam).

[¶ 145]  At this preliminary stage and with an incomplete administrative record, the Court believes it is inappropriate to either issue North Dakota's desired declaratory relief or an order to compel lease sales to occur. <u>See</u> <u>Tumey</u>, 27 F.4th at 664. Based on the analysis and facts above, the Court does, however, find it necessary and appropriate to issue a preliminary injunction to prevent the Federal Defendants from implementing their Stop in North Dakota in order to preserve North Dakota's rights pending a final judgment on the merits. 5 U.S.C. § 705. <u>See also</u> 5 U.S.C. § 706(1).

## CONCLUSION

[¶ 146] Based upon the foregoing, North Dakota's Motion for Preliminary Injunction is **GRANTED, in part,** as to North Dakota's request for an order enjoining and restraining the Federal Defendants' implementation of the Stop in the State, **and DENIED, in part,** as to North Dakota's desired declaratory relief and order compelling the Federal Defendants to hold the previously cancelled quarterly lease sales for "available" lands. Doc. No. 68.

[¶ 147] The Court concludes the Federal Defendants are **ENJOINED and RESTRAINED** from imposing the Stop, which this Court defined as the "unlawful policy to disregard their statutory duty to appropriately plan for and complete their determination of whether nominated land was 'available' and 'eligible' on a timely, quarterly basis." **IT IS FURTHER ORDERED** that the Federal Defendants shall:

1.  Analyze individual parcels nominated for lease sales in North Dakota according to their statutory requirements;

2.  Make lawful determinations regarding the nominated parcels' availability and eligibility;

3.  Complete those determinations in time for quarterly lease sales, as set forth in statute and regulations; and

4.  When there are "available" and "eligible" lands, hold a lease sale in that quarter.

See 30 U.S.C. § 226(a), (b)(1)(A), (f), (m). Furthermore, based on the foregoing, the Federal Defendants are **ENJOINED and RESTRAINED** from *de facto* withdrawing lands in North Dakota identified for oil and gas development in their respective RMPs without following the statutory procedures for public notice and comment as well as congressional notice, where appropriate. See 43 U.S.C. §§ 1714, 1732. See also 5 U.S.C. §§ 705, 706(1).

[¶ 148] This preliminary injunction shall remain in effect pending the final resolution of this case, or until further orders from this Court, the United States Court of Appeals for the Eighth Circuit, or the United States Supreme Court are issued.

[¶ 149] North Dakota requests no security be required under Federal Rule of Civil Procedure 65(c) in connection with this preliminary injunction. Neither the Federal Defendants nor Intervenors oppose the State's request. The Court will, accordingly, order no security from North Dakota. Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs, 826 F.3d 1030, 1043 (8th Cir. 2016) (noting a waiver of security may be particularly proper where there is no objection).

[¶ 150] Given the Court's finding of the Stop, the multiple unfruitful assurances given to this Court by the Federal Defendants, the coming and going of the 2021 Louisiana Injunction without any lease sale in North Dakota until Q2 2022, and in furtherance of the preliminary injunction issued here, the Court **ORDERS** the Parties to: (1) provide the Court within two weeks of this Order's issuance a schedule of when lease sales will take place in 2023 in North Dakota; (2) appear in-person for a status conference before this Court at least one week before the statutory deadline to issue a quarterly Notice of Competitive Lease Sale in North Dakota so long as this preliminary

injunction remains active, see 30 U.S.C. § 226(f) ("At least 45 days before offering lands for lease under this section, . . . the Secretary shall provide notice of the proposed action."); and (3) file a report with the Court one week in advance of the scheduled status conference detailing which lands in North Dakota have been nominated for inclusion in the quarterly lease sale (both those deferred from prior quarters and those newly nominated) and which stage of review those parcels have completed.[67]

[¶ 151] **IT IS SO ORDERED.**

DATED March 27, 2023.

Daniel M. Traynor, District Judge
United States District Court

_____

[67] The purpose of these conferences will be for the Federal Defendants to provide a status update regarding: (1) how many "eligible" parcels in North Dakota were nominated (including those deferred from prior quarters that remain "eligible") and are being considered for the upcoming relevant quarterly lease sale; (2) how many of those individual parcels in North Dakota have undergone "availability" and "eligibility" analyses according to Congress' timeline and design; (3) if any parcels in North Dakota have been determined "available" and "eligible" for the relevant, upcoming quarterly lease sale; and (4) the stage of the Federal Defendants' plans and preparations, if any, to hold a quarterly lease sale in North Dakota for the relevant time period. See 30 U.S.C. § 226(b)(1)(A). See also 5 U.S.C. § 705 ("[T]he reviewing court[] . . . may issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings."); United States v. Kahn, 415 U.S. 143, 147 (1974) (noting the district court ordered status reports to show "what progress had been made toward achievement of the order's objective").